No. 04-027

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 190

MONTANANS FOR THE RESPONSIBLE USE OF
THE SCHOOL TRUST,

   Plaintiff and Appellant,

 v.

SCOTT DARKENWALD, Treasurer of the State of Montana;
STATE BOARD OF LAND COMMISSIONERS, MONTANA
BOARD OF INVESTMENTS, and BUD CLINCH, Director
of the Department of Natural Resources & Conservation,

   Defendants and Respondents.


APPEAL FROM:  District Court of the First Judicial District,
       In and for the County of Lewis and Clark, Cause No. ADV-2001-130,
       The Honorable Dorothy McCarter, Judge presiding.


COUNSEL OF RECORD:

   For Appellant:

      Roy H. Andes (argued), Attorney at Law, Helena, Montana

   For Respondents:

      Tommy H. Butler (argued), Special Assistant Attorney General, Montana
      Department of Natural Resources and Conservation, Helena, Montana

      Hon. Mike McGrath, Attorney General; Candace West,
      Assistant Attorney General, Helena, Montana


         Argued: February 2, 2005
        Submitted: February 8, 2005
         Decided: August 9, 2005

Filed:


            Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 Appellant Montanans for the Responsible Use of the School Trust (Montrust) alleges that parts of the statutory scheme for administering the school trust lands violate the Montana Constitution and the Enabling Act. Montrust appeals from an order entered by the First Judicial District Court, Lewis and Clark County, granting judgment to Respondents, Scott Darkenwald, in his representative capacity as Treasurer of the State of Montana, State Board of Land Commissioners (Land Board), Montana Board of Investments (BOI), and Bud Clinch, in his representative capacity as Director of the Department of Natural Resources & Conservation (DNRC) (collectively the "State"). We affirm.

¶2 Montrust raises numerous issues, but we need address only the following to resolve this matter:

¶3 1. Whether the State's commingling of the interest earned on school trust income and the revenue generated from the Spring Creek Bonuses into the State General Fund (General Fund) constitutes a breach of the State's duties under the Montana Constitution and the Enabling Act.

¶4 2. Whether the State, when enacting and implementing Senate Bill 495, partially codified at § 17-6-340, MCA, violated its trust duties pursuant to the Montana Constitution and the Enabling Act.

¶5 Montrust's withdrawal of its claim that the District Court improperly refused to award attorney's fees to Montrust eliminates our need to analyze that issue.

2

¶6    In *Montanans for the Responsible Use of the School Trust v. State ex rel. Board of Land Comm'rs* (*Montrust I*), 1999 MT 263, ¶ 13, 296 Mont. 402, ¶ 13, 989 P.2d 800, ¶ 13, we restated our long-standing precept that the Montana Constitution and the Enabling Act impose a trust duty on the State regarding school trust lands.  We held in *Montrust I* that several statutes violated the State's duty to obtain full market value for school trust lands pursuant to the Montana Constitution and the Enabling Act, Act of February 22, 1889 (Enabling Act), § 11, ch.180, 25 Stat. 676 (1889), and that the Land Board, through its school trust land lease prices and procedures associated with those statutes, had breached its trustee duties by benefitting third parties to the detriment of the school trust's beneficiaries. *Montrust I*, ¶¶ 23, 32, 42, 51, 58.  Montrust now alleges further constitutional violations and breaches of trust by the Land Board arising from the State's alleged improper commingling of trust assets into the General Fund and the State's sale of a 30-year future stream of mineral royalties from school trust land in exchange for an immediate cash infusion of $46.4 million.

¶7    *Montrust I* discusses at length the school trust's history and constitutional underpinnings as well as the State's trustee duties.  *See Montrust I*, ¶¶ 13-17.  We will not repeat that discussion here.  We must provide a brief summary regarding the current statutory scheme, recent legislative changes, and administrative measures made in response both to *Montrust I* and this current action, however, to understand Montrust's present allegations.

PRE-2001 STATUTORY SCHEME

¶8    The school trust consists of a distributable fund and a permanent trust fund.  The

3

distributable fund includes ninety-five percent of both the revenue directly received from school trust lands and the interest earned by the permanent fund (distributable income). Sections 20-9-341 and 20-9-620, MCA (2003). The permanent trust fund consists of proceeds from the sale or other permanent disposition of school trust assets plus five percent of the distributable income. Sections 20-9-341 and 20-9-601, MCA (2003).

¶9 Before July 1, 2001, the Legislature required the Land Board to deposit annually the distributable income for each calendar year directly into the General Fund to be disbursed to public schools. Section 20-9-342, MCA (1999). The Land Board, at that time, retained the funds produced from the school trust lands and the BOI invested those funds in order to generate interest. Section 17-6-201(1), MCA (1999). The State then pooled all of the interest earned from the school trust fund with its other revenue into the General Fund and credited the accumulated interest to the General Fund as a whole. Section 17-6-202(2), MCA (1999). The General Fund serves as a common fund into which the State deposits all revenues unless the Legislature specifically designates that revenues be deposited into some other account. Section 17-2-102(1)(a), MCA (2003). Although the State maintained records for the distributable income deposited into the General Fund, the State did not earmark those deposits in any manner, and no statutory sub-fund, sub-account or special revenue account segregated the distributable income from other revenues in the General Fund.

## 2001 AND 2002 AMENDMENTS

¶10 In response to the present case, the Legislature enacted House Bill 41 (HB 41), Ch. 554, L. 2001, amending § 20-9-342, MCA, during the 2001 regular session. HB 41 created

a special sub-fund of the General Fund specifically designated to receive distributable school trust revenues. Before the creation of this sub-fund, the Land Board removed ninety-five percent of all calendar year 2000 school trust revenues in its accounts and deposited them, pursuant to § 20-9-342, MCA (1999), into the General Fund with all other State monies. These trust revenues included, among others, rental and bonus payments on various coal leases in Big Horn County belonging to Spring Creek Coal Company (Spring Creek Bonuses) that amounted to $6,215,550. The Spring Creek Bonuses were not received until after the 1999 Legislature adjourned, and therefore, were not legislatively appropriated.

¶11 The 2002 special session Legislature, however, again in response to this case, further amended the scheme by enacting House Bill 7 (HB 7), Sections 2 and 4, Ch. 10, Sp. L. Aug. 2002, amending § 20-9-342, MCA, and § 20-9-622, MCA. These amendments provided that distributable income be deposited into a "guarantee account" in the state special revenue fund, statutorily appropriated for distribution to public schools (the guarantee account), rather than a sub-fund of the General Fund.

¶12 The 2001 Legislature also enacted Senate Bill 495 (SB 495), Ch. 418, L. 2001, partially codified as § 17-6-340, MCA. SB 495 authorized DNRC to borrow up to $75 million from the coal trust severance tax permanent fund for 30 years to buy mineral production royalties owned by the school trust. The State intended to enhance short-term distributable revenue from the permanent fund for the benefit of public schools as evidenced by testimony from then-Secretary of State Bob Brown (Brown) and Superintendent of Public Instruction, Linda McCulloch (McCulloch), both of whom testified in their capacity as Land

5

Board members.

¶13 Brown testified that "the two political parties were at loggerheads. One political party was opposed to tax increases and the other party didn't want to violate the coal trust." Brown opined that SB 495 represented a compromise offered by the Legislature in response to the Land Board's concerns regarding the State's underfunding of public schools. McCulloch also testified how SB 495 addressed the public schools' need for increased funding and related the importance of the money generated from SB 495's deposit into the permanent trust going into the base budgets of schools.

¶14 In attempting to determine full market value, the State calculated that the future stream of mineral royalties owned by the school trust had a present value of $138 million. The State calculated that repaying this amount over 30 years at a 9.81 percent discount rate would result in the permanent fund immediately receiving $46.4 million. The Land Board ultimately authorized DNRC to borrow $46.4 million that DNRC then used to purchase the 30-year future stream of mineral royalties from the school trust.

¶15 The Land Board, for its part, deposited the $46.4 million into the permanent fund. This immediate $46.4 million infusion generated increased interest earnings of approximately $5 million in both 2002 and 2003 that the State, in turn, distributed to public schools. Short-term distributable income also increased by approximately $3 million. This short-term increase to distributable income likely will prove to be decidedly temporary, however, as the State projects that it will decline each year to zero dollars by 2013.

¶16 The State will not deposit the 30-year future mineral revenue stream into the trust,

however, as it no longer represents an asset of the school trust. Instead, DNRC will use a portion of the future mineral revenue stream to repay the 30-year loan to the coal trust severance tax permanent fund and it will deposit the remaining royalties into the guarantee account established by HB 7. DNRC also will deposit short-term distributable income from this transaction into the guarantee account. The State uses the guarantee account to reimburse the General Fund for lost coal trust interest and, if there are any revenues left over, distributes them to public schools.

¶17 In 2002, the Legislature appropriated $440 million in K-12 base aid, approximately ten times more money for public schools than the $45.2 million generated from school trust lands. The State also has kept accounting records that allow beneficiaries to determine the revenues received from any particular tract of school trust land.

PROCEDURAL HISTORY

¶18 Montrust initiated this action on February 23, 2001. It sought declaratory relief that the statutory scheme for the appropriation of distributable revenue from the school trust violated the Montana Constitution and Enabling Act. Montrust sought preliminary and permanent injunctive relief prohibiting the Land Board from transferring interest income and the Spring Creek Bonuses into the General Fund. Montrust also sought to recoup its attorney's fees and costs pursuant to the private attorney general doctrine.

¶19 As discussed in ¶¶ 10-11 above, the Legislature modified the statutory scheme several times in response to Montrust's action. Montrust amended its pleadings to conform to the evolving statutory scheme. Montrust again amended its complaint on April 24, 2002, to seek

7

an accounting of the school trust regarding the interest income and Spring Creek Bonuses and to assert its theory that SB 495 violated the State's trust duties under the Montana Constitution and the Enabling Act. Montrust also modified its attorney's fees claim to one grounded in the catalyst theory.

¶20 The District Court held a trial on March 31, 2002, where numerous witnesses representing various state agencies, as well as each party's expert witness, testified. The District Court concluded that Montrust had failed to prove financial harm to the school trust's beneficiaries stemming from the interest income and Spring Creek Bonuses being placed into the General Fund, particularly when the Legislature's appropriation to public schools far exceeded the combined money produced by the Spring Creek Bonuses and the interest income. The District Court also concluded that SB 495 involved only the sale of mineral production rights, rather than the permanent disposition of any tracts of state lands, and thus, was not prohibited by the Enabling Act. With respect to the SB 495 transaction, the District Court concluded that the present value discount rate of 9.81 percent used by the State was reasonable in light of the characteristics and volatility of the asset. Therefore, the District Court found that Montrust had failed to prove that the State sold the future stream of mineral royalties for less than full market value. Finally, the District Court concluded that SB 495 benefitted both present and future school districts, and as such, Montrust fell short of proving that the State had failed to act in the best interests of all beneficiaries.

¶21 Montrust appeals from the District Court's order and alleges that the statutory scheme, under HB 41 and HB 7, results in the State breaching its trust duties based upon the improper

commingling that occurs when the State deposits the trust's interest first into the General Fund, and now into the guarantee account, without earmarking or accounting for it. Montrust further contends the statutory scheme proves particularly flawed in light of the State's administration of the Spring Creek Bonuses. Montrust also presses its challenges to the constitutionality of SB 495.

## STANDARD OF REVIEW

¶22 To determine whether the statutes comply with the constitutional mandates of the trust and the State's fiduciary duties as trustee, we review a district court's conclusions of law to determine whether they are correct. *Montrust I*, ¶¶ 11, 19. We will presume a statute's constitutionality and will avoid an unconstitutional interpretation whenever possible. *Montrust I*, ¶ 11. A party challenging a statute's constitutionality bears the burden of proving the statute unconstitutional and we resolve any doubt about its constitutionality in favor of the statute. *Montrust I*, ¶ 11. We will uphold a statute except when a party proves it to be unconstitutional beyond a reasonable doubt. *Montrust I*, ¶ 11.

## DISCUSSION

## ISSUE ONE

¶23 Whether the State's commingling of the interest earned on school trust income and the revenue generated from the Spring Creek Bonuses into the General Fund constitutes a breach of the State's duties under the Montana Constitution and the Enabling Act.

¶24 We long have recognized that the State serves as a trustee of school trust lands and the Land Board administers the trust. *See Montrust I*, ¶ 14. We also have acknowledged that

9

the Land Board "is bound, upon principles that are elementary, to so administer [the Trust] as to secure the largest measure of legitimate advantage to the beneficiary of it[,]" and that it "owe[s] a higher duty to the public than does an ordinary businessman." *Montrust I*, ¶ 14 (citations omitted).

¶25 Montrust argues that the current statutory scheme fails to earmark and keep separate the interest income produced from school trust revenues because the State pools all funds and accounts, including the General Fund, and credits the interest accumulated to the General Fund and not to any special account. *See* § 17-6-202(2), MCA. Montrust further alleges that the State's commingling of the Spring Creek Bonuses with the General Fund prevents it from determining whether the bonuses were distributed to public schools or diverted to other legislative appropriations. Both parties agree that, except for interest income and the Spring Creek Bonuses, the current statutory scheme provides a workable solution for most of Montrust's concerns regarding alleged commingling.

¶26 To begin, we conclude that the State commingled the interest from school trust income and the Spring Creek Bonuses into the General Fund pursuant to the governing statutory scheme. The State's commingling, however, does not translate necessarily into a violation of its trust duties to distribute funds deriving from school lands to public schools pursuant to Section 11 of the Enabling Act (Section 11). The State asserts that in this instance, we must determine whether the funds pooled in the General Fund can be traced to their origin, not whether funds from different sources merely co-exist in the General Fund. Montrust counters that it cannot prove the State's failure to distribute the interest income or

10

bonuses because it cannot trace the interest income and bonuses through the process from deposit to distribution.

¶27    We must not miss seeing the forest amidst all the trees in this matter. The Land Board accounted for the exact amount of interest and bonuses deposited into the General Fund and reported it to the school trust's beneficiaries, as evidenced by the fact that Montrust has been able to ascertain that exact amount throughout this litigation. *See* § 72-34-124, MCA (providing that a trustee has a duty to keep the beneficiaries of the trust reasonably informed of the trust and its administration). Moreover, Montrust also can ascertain the legislative appropriation to public schools from the General Fund. This amount, as the District Court pointed out, far exceeds any interest earned or bonuses derived from the school trust corpus.

¶28    Montrust points to *Cobell v. Babbit* (D.D.C. 1999), 52 F.Supp.2d 11, to highlight the strictness of trust accounting in general, and commingling in particular. *Cobell* concerned the Secretary of Interior's trust administration of Indian land allotments. The *Cobell* court noted that the federal government, pursuant to its trust duty, could not give individual Indian allottees an accounting, and in fact, could not even produce many documents that would be required to conduct such an accounting. *Cobell*, 52 F.Supp.2d at 32. Montrust's allegations here, even if true, fail to approach the complete dereliction of trust duties found in *Cobell*. Further, the *Cobell* court did *not* address commingling because it determined that the trustee could not even produce many documents necessary to perform an accounting. We reiterate that Montrust, by contrast, has been able to ascertain the amount of interest income and bonuses deposited into the General Fund and has been able to ascertain that the amount

11

appropriated to public schools from the General Fund far exceeds that amount. This fact again negates any financial harm allegedly suffered by Montrust. Accordingly, *Cobell* is not relevant to our disposition of this case.

¶29 The State's duty as trustee under these circumstances requires it to be able to prove "that the information in the accounting is sufficiently accurate and complete to enable the beneficiaries to protect and defend the equitable or beneficial interest." *Loring, A Trustee's Handbook* § 8.24, at 622 ( Charles E. Rounds, ed., 2005). Montrust fails to demonstrate the imperative under these circumstances of tracking the interest income from deposit to distribution, particularly given that Montrust neither has proven, nor alleged, that the State has wrongfully disposed of the interest income. The District Court's finding that the evidence presented at trial demonstrated that various state agencies document and maintain income and receipts concerning school trust income further hinders Montrust's argument. In fact, the District Court concluded that although none of the witnesses who testified at trial knew where the trust's income had been or was being deposited, Montrust failed to prove financial harm on that basis, particularly when the legislative appropriation to public schools far exceeds any interest earned from the trust corpus.

¶30 We determine that the State, therefore, has satisfied its trust obligations by demonstrating that its accounting system, even with commingling, "is sufficiently accurate and complete" to allow Montrust to ascertain that all trust revenues go to benefit public schools. *Loring* § 8.24, at 622. This conclusion is especially fitting when our review of the record confirms that Montrust does not specify any particular accounting entry or practice

that is inaccurate or deprives public schools of their trust distributable income. We cannot rationalize, under this scenario, that the State's commingling of interest income with other monies in the General Fund constitutes a breach of the State's trust duties.

¶31    Montrust also alleges that because the Spring Creek Bonuses constituted unanticipated revenue, were not legislatively appropriated, and were commingled with the General Fund, the bonuses were used to benefit legislative appropriations other than increasing public school funding. Montrust maintains that the State needs to account for the Spring Creek Bonuses and restore this revenue from the General Fund back to the school trust. Montrust again fails to demonstrate, however, how the deposit of the Spring Creek Bonuses into the General Fund constitutes improper commingling in light of the fact that, again, it can ascertain the amount and that the State, as trustee, expended a far greater amount to be distributed to public schools. At the very least, Montrust fails to carry its burden of proving that the State withheld either the interest income or the Spring Creek Bonuses or improperly diverted these funds to other non-trust purposes. We conclude the District Court correctly determined that Montrust failed to prove financial harm to the beneficiaries arising from its claimed lack of an accounting.

¶32    Montrust next argues that the State's commingling of interest income and Spring Creek Bonuses with the General Fund constitutes a *per se* breach by virtue of the simple fact that the trust exists. Montrust alleged in its complaint that it suffered substantial harm merely from the commingling and that such harm will continue to be suffered unless the court permanently enjoined the State from implementing and enforcing such commingling.

Montrust directs us to several treatises and decisions from other jurisdictions to demonstrate its *per se* breach contention. For example, Montrust points to the Idaho Supreme Court's decision in *Moon v. State Bd. of Land Comm'rs* (Idaho 1986), 724 P.2d 125. *Moon* strikes us as a peculiar authority to support Montrust's strict interpretation of trust duties. The court upheld a statute that diverted up to ten percent of the revenues obtained from leases and timber sales on school trust lands from public schools into a special account to be used for administrative expenses. *Moon*, 724 P.2d at 128. The court concluded that expenses incurred in administering the trust corpus represented "reasonable deductions." *Moon*, 724 P.2d at 129 (citations omitted). These "reasonable deductions" came at the expense of distributions to public schools – a result seemingly at odds with Montrust's view that all revenues generated from school trust lands, including interest on these revenues, must be distributed to public schools.

¶33    The *Moon* court also addressed the separate issue of whether the state treasurer's deposits of the interest earned from this special account to the general fund, instead of back into the special account, violated the State's trust duties and the Idaho Constitution. Once again, the Idaho Supreme Court held that the interest earned on those special accounts represented an integral part of the total monies received from school trust lands, and therefore, had to be used for protection of school trust lands under the statute and its constitution. *Moon*, 724 P.2d at 130. In that case, the protection of school trust lands included the diversion of ten percent of revenues, plus interest, to the administration of school trust lands at the expense of distribution to public schools.

14

¶34    Here we have an instance where the interest income, although deposited into the General Fund, *is* being used for its purpose according to Section 11–that of distribution to public schools. The Idaho statute required that up to ten percent of the revenues, plus interest, be diverted from distribution to public schools and into a special account to cover reasonable administrative expenses. In the instant case, unlike in *Moon*, Montrust has not proven that the State somehow is diverting interest income away from public schools and applying it to non-trust purposes.

¶35    To recapitulate, we determine that Montrust's allegations in this matter do not translate into proof of substantial harm or breach of trust. As we stated in ¶ 26 above, under the current statutory scheme, the State places both interest income and the Spring Creek Bonuses into the General Fund. The State uses the General Fund, in large part, for distribution to public schools. Montrust has not proven that the State failed to distribute the interest income or the Spring Creek Bonuses to public schools. Under these circumstances, a *per se* breach analysis does not apply.

¶36    We conclude that the State's statutory scheme does not breach its trustee duty under the Montana Constitution or the Enabling Act when it requires the depositing of interest income and the Spring Creek Bonuses into the General Fund.

ISSUE TWO

¶37    Whether the State, when enacting and implementing Senate Bill 495, partially codified at § 17-6-340, MCA, violated its trust duties under the Montana Constitution and the Enabling Act.

¶38    Montrust contends that SB 495, "horrendously violates the supposedly 'inviolate' school trust" and "creates a convoluted shell-game of governmental finance." Turning over a few shells, however, reveals that the State did not violate those trust duties mandated by the Montana Constitution and the Enabling Act when enacting and implementing SB 495.

¶39    Section 11 provides that "the proceeds from the sale and permanent disposition of any of the said lands and from every part thereof, shall constitute permanent funds." Montrust declares that this requirement appears in Section 11 "precisely to prevent shell-game schemes like SB 495[,]" and urges us to view the future stream of mineral royalties as proceeds from the sale of parts of school trust lands that cannot be sold. Under that view, Montrust maintains, SB 495's authorization of the $46.4 million loan in exchange for the future stream of mineral royalties, results in a *per se* breach of the State's fiduciary duty to preserve the corpus of the trust. We have consistently rejected such narrow views that unreasonably constrict the Land Board in carrying out its duties and do so, likewise, in this case.

¶40    We previously have held that Section 11 authorizes the State to administer and manage state trust lands in such a manner that contemplates that an interest or estate less than the fee may be leased or disposed. *Hughes v. State Bd. of Land Comm'rs* (1960), 137 Mont. 510, 517, 353 P.2d 331, 336 (upholding a statute authorizing the Land Board to lease state lands for underground storage of natural gas). We also have determined that a royalty in mining and oil operations "means a share of the produce or profit paid to the owner of the property. . . . [which] is quite different from a share or interest in the property itself." *Rist v. Toole County* (1945), 117 Mont. 426, 432, 159 P.2d 340, 342 (citations omitted). Further,

16

in *Toomey v. State Bd. of Land Comm'rs* (1938), 106 Mont. 547, 81 P.2d 407, we recognized that the Land Board's decision to enter into a "pooling agreement" with private parties to explore for natural gas is well within the Land Board's discretion as it constitutes one of the types of arrangements "whereby oil and gas possibilities may be exploited" pursuant to Section 11. *Toomey*, 106 Mont. at 560, 81 P.2d at 414; *see also State ex rel. Blume v. State Bd. of Educ.* (1934), 97 Mont. 371, 34 P.2d 515 (upholding the Board's decision to pledge income from trust lands to cover the cost of bonds issued to finance construction of the campus at Eastern Montana State Normal School in Billings).

¶41 Similar to the rationale present in *Hughes*, *Rist* and *Toomey*, the State has not disposed of any permanent interest in land under SB 495, rather, it has exercised its discretion to enter into a loan agreement to exploit mineral production – an agreement for which it received full market value. *See* ¶ 49 below. SB 495 authorized an agreement where the State deposits the loan amount into the permanent fund thereby increasing the amount distributed to its beneficiaries. The State then dedicates the future stream of mineral royalties, for which the School Trust has been paid full market value, to servicing the loan over a 30-year period. The State distributes any surplus cash flow to the trust beneficiaries. Once the State repays the loan, it again will deposit future royalties directly into the permanent fund. We cannot view the State's trust duties to be so constricted as to prohibit this type of transaction. We conclude that the transaction authorized by SB 495 constitutes another method "whereby [mineral] possibilities may be exploited" pursuant to Section 11. *Toomey*, 106 Mont. at 560, 81 P.2d at 414.

¶42 We recognize, however, that Section 11 also imposes a requirement that the State obtain full market value for school trust lands. *Montrust I*, ¶ 14. We must next determine whether the State acted contrary to its fiduciary duty to obtain full market value for the future stream of mineral royalties in enacting SB 495, as alleged by Montrust. In *Montrust I*, we concluded that a statute does not facially violate the trust if its plain language does not abrogate Section 11's mandate that full market value be obtained for school trust lands. *Montrust I*, ¶ 36. We further concluded that a party challenging the statute must show that the State, in implementing the statute, violated its fiduciary duty to obtain full market value. *Montrust I*, ¶ 36.

¶43 In *Montrust I*, we rejected a facial challenge to the cabin site renewal provision contained in § 77-1-208, MCA, based upon its alleged "eschewal" of competitive bidding to determine full market value. *Montrust I*, ¶¶ 34-36. The statute authorized DNRC to determine "full market value based on the appraisal of the cabin site value." Section 77-1-208 (1), MCA. We recognized that the statute on its face did not violate the trust and further noted that the Legislature is "given authority to determine the method by which full market value is ascertained." *Montrust I*, ¶ 36 (quoting *Jerke v. State Dept. of Lands* (1979), 182 Mont. 294, 296, 597 P.2d 49, 51 (citation omitted)). Nothing in the plain language of SB 495 abrogates the trust's mandate that the State obtain full market value for school trust lands. SB 495 expressly directs that the DNRC may purchase the future stream of mineral royalties from school trust lands for full market value. It remains for the State, consistent with its trust duties, to determine the method by which to ascertain full market value.

18

*Montrust I*, ¶ 36.

¶44     We turn now to the method selected by the State to ascertain full market value.  To determine the amount of the loan authorized by SB 495, the State used a discounted cash flow calculation to value the future stream of mineral royalties that resulted in a 9.81 percent discount rate.  This calculation asserts that the future stream of mineral royalties from school trust lands has a value of $138 million over the next 30 years.  The State's use of a 9.81 percent discount rate over this future 30-year period resulted in the present loan amount of $46.4 million.  The State maintains that the Land Board, under this valuation scheme, obtained full market  value for the future stream of mineral royalties.

¶45     Montrust disagrees with the manner in which the State calculated the loan amount, and asserts that the 9.81 percent rate used for SB 495 "was largely plucked from thin air during the last days before implementation [of SB 495]."  We find ample evidence in the record that the State considered many variants of SB 495's transaction.  Jason Thielman (Thielman), then-Chief Deputy Secretary of State, testified at trial that the trustees, including the Secretary of State, BOI, and the Office of Public Instruction (OPI) met, discussed, and mutually agreed upon the 9.81 percent discount rate after considering a number of other options.  Their discussion specifically considered the full market value requirement.

¶46     The District Court also heard expert testimony presented by both parties regarding the appropriate discount rate to be applied to the transaction in order to determine full market value. The district court sits in the best position to observe and judge witness credibility and we will not second guess its determination regarding the strength and weight of conflicting

19

testimony. *In re Marriage of Horton*, 2004 MT 353, ¶ 19, 324 Mont. 382, ¶ 19, 102 P.3d 1276, ¶ 19 (citation omitted). The District Court found the State's expert witness, Dewain Immel (Immel), to be more credible and that the basis for his assessment of the appropriate discount rate was better suited to the assets at issue in this matter.

¶47 Our review of the record reveals no reason to dispute the District Court's finding, especially in light of the relative qualifications of the parties' expert witnesses. The State's expert, Immel, holds a Bachelor of Science degree in finance and accounting, spent approximately ten years working in the field of commercial and project finance, with the last eight of those years dealing specifically in oil and gas and energy and independent power project financing. He became an independent oil and gas operator after leaving the banking business. Immel structured financing in excess of one billion dollars of oil and gas production loans and secured production loans with different types of royalties and minerals. He also has been personally responsible for acquiring $100 million of oil and gas properties by evaluating the future revenue streams of oil and gas production. Immel testified that the State's determination of the discount rate was reasonable in view of the fact that the typical range for this type of asset is a 15 to 20 percent rate.

¶48 Montrust's own expert witness, Gerard Berens (Berens), failed to complete his bachelor's degree in engineering. Although Berens worked as an economic consultant in the finance industry, he conceded at trial that he does not have any experience in buying, selling, or valuing mineral properties. Thus, the District Court found less persuasive Berens's testimony that the State's discount rate of 9.81 percent was too high and should have been

20

somewhere between 4.07 and 5.49 percent.

¶49 Under these circumstances, we agree with the District Court that the State properly determined full market value for the future stream of mineral royalties. The District Court considered expert testimony and reviewed reams of exhibits relating to full market value of the future stream of mineral royalties. After reviewing this evidence, the District Court concluded that the State's method of determining the appropriate discount rate was neither arbitrary nor a breach of the State's trustee duty to obtain full market value. We agree with the District Court's conclusion that the evidence established that the discount rate used by the State is reasonable, and thus, reflects the full market value of the future stream of mineral royalties.

¶50 Montrust similarly asserts that the State violated Section 11 of the Enabling Act when it failed to perform an independent appraisal to determine the full market value of the future stream of mineral royalties. The District Court concluded that the State's failure to conduct an independent appraisal did not automatically constitute a violation of Section 11. We previously addressed this issue indirectly when we held that when the State sells only an estate or interest in land, Section 11 provides the State with ample power to determine the method by which to ascertain the full market value of the estate or interest. *Hughes*, 137 Mont. at 522, 353 P.2d at 338; *Toomey*, 106 Mont. at 561, 81 P.2d at 415. We also have allowed situations where the State determined full market value of state lands using a "computation of the present value of the royalty interest of the State based upon the number of cubic feet of recoverable gas remaining in the ground." *Hughes*, 137 Mont. at 523, 353

P.2d at 338. We determined that, as here, "every reasonable effort was put forth to ascertain the present fair value of the [minerals]. . . . and there is no assurance that [the school fund] would obtain any more for its royalty interest than what was allowed by the [Land Board]." *Hughes*, 137 Mont. at 523, 353 P.2d at 339.

¶51 We recognize that the sale of the future stream of mineral royalties authorized by SB 495 constitutes something less than the whole interest in the school trust lands at issue. In this instance, the Legislature decided that the loan amount would constitute the full market value. The Land Board then needed to decide the method of exchange, and it determined that a present valuation of its future stream of mineral royalties using a 9.81 percent discount rate proved appropriate. As we note in ¶¶ 46-49 above, the District Court heard expert testimony regarding the discount rate and found the State's expert witness's assessment of the appropriate discount rate better suited to the assets at issue in this matter. Witness testimony also showcased the Land Board's consideration of various risk components when deciding the amount at which it would be willing to sell the future stream of mineral royalties.

¶52 We long have acknowledged that the Land Board bears the task of ensuring that the trust receives full market value from the sale or disposal of any interest or estate in school trust land. On this matter we will not substitute our opinion for the Land Board's opinion and we will not "control the discretion of the board unless it appears that the action of the board is arbitrarily and, in effect, fraudulent." *Toomey*, 106 Mont. at 562, 81 P.2d at 415 (citation omitted). We caution the State, however, that an independent appraisal represents

22

the most reliable method of ensuring that the trust receives full market value. We would not hesitate to invalidate the transaction authorized by SB 495 in the event that the State had not received full market value for the future stream of mineral royalties. *Montrust I*, ¶¶ 32, 42, 51, 58.

¶53 Moreover, as the challenging party, Montrust, despite its assertions otherwise, bears the burden of proving the statute unconstitutional beyond a reasonable doubt. *Montrust I*, ¶ 11. We cannot view the 9.81 percent discount rate as a breach of the State's fiduciary duty under the Enabling Act in light of our conclusion that the 9.81 percent discount rate provided full market value for the transaction authorized by SB 495. Montrust has failed to carry its burden of proving that the Land Board's decision to use a reasonable discount rate in determining full market value of the future stream of mineral royalties rises to the level of an "arbitrarily . . . fraudulent" action that would violate Section 11. *Toomey*, 106 Mont. at 562, 81 P.2d at 415.

¶54 We next evaluate Montrust's claim that SB 495 improperly favors present beneficiaries to the detriment of future beneficiaries in violation of its trust duties. Montrust argues that the current distribution of the future stream of mineral royalties deprives trust benefits to future beneficiaries via an annual decline of short-term distributable income to zero dollars by 2013. Montrust claims that SB 495 will cause the permanent fund to be worth approximately $94 million less in thirty years than without SB 495. This alleged decrease, Montrust contends, results from SB 495's removal of the future stream of mineral royalties from the corpus of the trust as well as the loss of the one-time increase from SB

23

495. As discussed above in ¶ 49, however, we determined that SB 495's transaction did not result in a depletion of the corpus as the Land Board received full market value for the future stream of mineral royalties. We will evaluate, however, Montrust's claim that SB 495 fails to balance the interests of the present and future trust beneficiaries.

¶55     Indeed the breach that Montrust alleges in this instance stands in stark contrast to *Montrust I* where we addressed the issue of the State violating its duty of undivided loyalty to trust beneficiaries by providing trust assets to private third-parties for less than full market value. We concluded there that the State had violated its trust obligations by charging less than full market value for a variety of activities, including: 1) rights-of-way across school trust lands; 2) cabin site licenses and leases; 3) removal of timber; and 4) removal of improvements by out-going lessees. *Montrust I*, ¶¶ 23, 32, 42, 51, and 58. The State's failure to obtain full market value inured to the benefit of a private third-party at the expense of trust beneficiaries. The State's trust responsibilities sharply proscribe its discretion in determining full market value under such circumstances. *Montrust I*, ¶¶ 14, 32; *see also* George G. Bogert and George T. Bogert, *The Law of Trusts and Trustees* § 543, at 217 (rev. 2d ed., replacement vol. 1993) (a trustee must act with undivided loyalty to the trust beneficiaries, to the exclusion of all other interests); *County of Skamania v. Washington* (Wash. 1984), 685 P.2d 576, 580-81 (noting that when the state transfers trust assets, it must seek full value for the assets and it may not sacrifice this goal to pursue other objectives, no matter how laudable those objectives may be).

¶56     Here Montrust does not allege that SB 495 involves the same type of breach of duty

of undivided loyalty to trust beneficiaries by providing trust assets to third-parties for less than full market value. Montrust alleges instead that SB 495 violates the State's duty not to favor present beneficiaries at the expense of future beneficiaries. The trustees enjoy far broader discretion in this context than the limited discretion afforded in the breach of duty of undivided loyalty situation described in *Montrust I*. For example, in *State ex rel. Thompson v. Babcock* (1966), 147 Mont. 46, 409 P.2d 808, we accepted the Land Board's discretionary authority to accept lease terms less than the highest bid in order to effectuate sustained yield concepts and ensure the long-term strength of the trust corpus.

¶57 Likewise, courts in other jurisdictions have accepted the need for the Land Board to follow various environmental and land-use regulations imposed by the legislature to the extent that these regulations do not deprive the Land Board of its power over school trust land. In *Colorado State Bd. of Land Comm'rs v. Colorado Mined Land Reclamation Bd.* (Colo. 1991), 809 P.2d 974, a mining company alleged that application of the state's mine reclamation law to its activities on school trust lands would violate the land board's obligations under the state constitution and the Enabling Act to maximize trust revenues. The court held that the state land commission did not violate its trust obligations by considering noneconomic factors, including the scenic and aesthetic effects of a proposed use, in managing school trust lands. Specifically, the court concluded that the state constitution and its Enabling Act did "not contemplate that the State Land Board can ignore a reasonable legislative regulation for the purpose of carrying out its constitutional responsibility of securing 'the maximum possible amount' for public lands." *Colorado State*

*Bd. of Land Comm'rs*, 809 P.2d at 985. *See also National Parks and Conservation Assoc. v. Board of State Lands* (Utah 1993), 869 P.2d 909, 923 (Durham, J., concurring) (noting that a strict requirement of undivided loyalty in managing trust land would lead to absurd results such as requiring the state "to allow any use of any tract of trust land, free from all regulation, as long as the trust received enough money").

¶58     These decisions upheld regulations that, in effect, constrained the ability of present beneficiaries from exploiting resources on school trust lands. These constraints indirectly favored future beneficiaries in that the resources would remain available for exploitation at some future date. In this vein, we evaluate Montrust's claim that SB 495 improperly favors present beneficiaries over future ones by distributing trust principal, or the future stream of mineral royalties, to present beneficiaries. The State's discretionary power over the subject of the trust and in managing school trust lands is limited to the requirements of the governing instrument, which in this case is the Enabling Act. *Montrust I*, ¶¶ 57-58 (citations omitted).

¶59     Berens, Montrust's expert witness, criticized the alleged reduction to the trust corpus over the 30-year life of the transaction authorized by SB 495. The District Court found his testimony unpersuasive, however, and concluded that the evidence indicated that the "corpus untouched was earning precious little income for present school district needs, nor was it significantly increasing the corpus to benefit future needs." The District Court further found that SB 495 favored present beneficiaries in that it addressed the State's funding shortfall by increasing immediately the amount of distributable income from the school trust.

¶60     Similarly, the District Court found that SB 495's transaction proved favorable to future

beneficiaries in that the increased amount of distributable income created the floor for future years of legislative appropriations, or BASE aid, to public schools. In other words, when SB 495 increased distributable income by $5 million, it resulted in a corresponding increase in BASE aid upon which the Legislature relies when deciding future appropriations. The record supports this finding. For example, OPI's Chief of Staff, Madalyn Quinlan, testified that this BASE aid amount rarely, if ever, decreases in future years.

¶61    Then-Secretary of State Bob Brown testified regarding the fact that the Land Board attempted to balance the needs of the present and future beneficiaries through SB 495. Superintendent of Public Instruction Linda McCulloch also conveyed the significance of the Land Board's decision to implement SB 495 in order to "make sure that the education isn't deteriorated in the next 30 years for those beneficiaries down the road." As we stated in *Skyline Sportsmen's Assoc. v. Board of Land Comm'rs* (1997), 286 Mont. 108, 114, 951 P.2d 29, 32, in the context of a proposed exchange of school trust land, "neither the Board's fiduciary duty to the trust beneficiaries nor . . . other factors" relieves the Board of its constitutional obligation to follow the "regulations and restrictions" imposed by the Legislature.

¶62    We view the transaction authorized by SB 495 as the State's attempt to fulfill its trust duties to the trust's beneficiaries given the shortage of public school funding at that time. The Land Board immediately increased the trust corpus by $46.4 million. This deposit generated new interest earnings that resulted in an additional $5 million being distributed to public schools in 2002 and 2003 and an increase in short-term distributable income by

27

approximately $3 million. Moreover, the testimony provided by Brown, McCulloch, and others satisfies us that the Land Board considered its duty to current and future beneficiaries and concluded that SB 495 helped both in that it gave future beneficiaries a very stable asset and opportunity for future growth, and at the same time, provided much-needed income for current beneficiaries. We agree with the State's contention that Montrust's disagreement with the Land Board over its policy of shifting some income from long-term to short-term beneficiaries provides an insufficient basis upon which to overturn its decision, particularly where the transaction does not deplete the permanent school trust fund, but only causes it to grow at a slower rate.

¶63 Finally, Montrust claims that the State's alleged breach of duties, taken as a whole, creates confounded beneficiaries who are unable to police the State's management of the trust. This confusion, according to Montrust, results in very few trust beneficiaries seeking an accounting or offering other input into management of trust resources. Montrust contends that this lack of beneficiary interest creates a situation where trustees may be more tempted to manage the trust based on political purposes or for their own benefit. Robert Bergmeier, Montrust's president, testified regarding the scarcity of beneficiary attendance at approximately forty Land Board meetings. This lack of attendance at meetings standing alone, however, fails to transform into proof of the beneficiaries' alleged confusion or lack of interest in general trust matters.

¶64 We conclude that the manner of the sale of the future stream of mineral royalties was reasonable and the State, by balancing the interests of the present and future beneficiaries

28

of the trust through SB 495, fully complied with all of the requirements of the Montana Constitution, the Enabling Act, and statutes, and therefore, did not violate its trust duties.

¶65    We affirm the District Court.


/S/ BRIAN MORRIS


We Concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ JIM RICE

Justice W. William Leaphart dissenting.

¶66     SB 495, through legislative legerdemain, achieves the short-term goal of immediate tax relief by depleting the educational resources of our future school children.  The Enabling Act requires the State of Montana to put every penny from mineral rights into the permanent school trust fund instead of distributing it as income.  Act of May 7, 1932, ch. 172, 47 Stat. 150, 151 ("the proceeds from the sale and other permanent disposition of any of the said lands and from every part thereof, shall constitute permanent funds for the . . . public schools . . . .") (amending Enabling Act, ch. 180, § 11, 25 Stat. 676, 679 (1889)); Montana Constitution Article I; Montana Constitutional Convention, Verbatim Transcript, March 13, 1972, p. 2150 ("so it's not a discretionary matter; the mineral rights are reserved to the school [trust] fund").  The Legislature has foisted a scheme to violate the inviolable trust upon both the District Court and this Court.  Montana Constitution Article X, Section 3. Through SB 495, the Legislature sold $139 million of future mineral royalties for the net present value of $46 million.  Then, in violation of its duties as trustee, the Legislature has been spending *all* of the interest on the $46 million.

¶67     Clearly, the Legislature would have to have put the $139 million proceeds from the mineral royalties directly in the trust, so, at the end of thirty years, the trust would have $139 million more than it had at year zero.  However, instead of reinvesting some of the interest on the $46 million net present value in the trust, an action necessary to realize the future value of $139 million, the Legislature is spending all of the interest on the $46 million on today's children to relieve current tax burden.  The result being that the future value of the

30

$46 million is flat: it will never increase at all—certainly not to the level of $139 million, the future value of the mineral royalties which were sold.

¶68    Plaintiff's uncontested exhibit shows that, at the end of thirty years, the trust will have only $46 million more in it instead of the $139 million more that it should have had at that point: a deficit of $93 million.[1]  The Legislature is required to preserve the interest on this $93 million difference for the benefit of future school children as Congress mandated in the Enabling Act.  It is not honoring that mandate.  Assuming the Land Board's 9.81 percent interest rate on that $93 million, the Legislature, with this Court's imprimatur, is stealing $9.1 million *every year* from the school children in years thirty-one, thirty-two, thirty-three, and forever more.

¶69    This analysis does not stop the Legislature from spending proper distributable interest. Compare the net present value to the future value.  The undisputed net present value of the mineral royalties is $46 million.  After thirty years at the Land Board's interest, the future value of that $46 million will be $768 million.[2]  In analyzing this interest from that $46 million, we must distinguish between (1) the interest needed to increase the $46 million into $139 million and thereby preserve the corpus of the trust,[3] and (2) the interest above and

---

[1]For simplicity's sake, these figures have excepted the 5 percent return of the interest to the principle, as provided in §§ 20-9-341, 20-9-620, MCA.

[2]See Exhibit A.

[3]See the gray boxes in Exhibit A.

beyond the interest needed to preserve the corpus, which becomes distributable income.[4]

Only if the Legislature returns enough interest to the trust so that the $46 million achieves the future value of $139 million, can it spend the remaining future value of $630 million interest ($768 million future value minus $139 million future corpus plus the rounding error) on the school children without violating the trust and without jilting future school children.

/S/ W. WILLIAM LEAPHART

Justice James C. Nelson and Justice Patricia Cotter join in the dissent of Justice Leaphart.

/S/ JAMES C. NELSON

/S/ PATRICIA O. COTTER

---

[4]See the white boxes with no borders in Exhibit A. The mineral proceeds themselves will finance the loan without needing any interest from the trust fund.

# EXHIBIT A

Retrieved Mineral Value (in millions)

| Year | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 4.7 | 4.9 | 4 | 3.5 | 3.1 | 2.8 | 2.4 | 2.2 | 1.9 | 1.8 | 1.6 | 1.5 | 1.3 | 1.2 | 1.1 | 1 | 0.9 | 0.8 | 0.8 | 0.7 | 0.6 | 0.6 | 0.6 | 0.5 | 0.5 | 0.4 | 0.4 | 0.4 | 0.3 | 0.3 | 0.3 |
| 1 | 5.2 | 5.4 | 4.4 | 3.8 | 3.4 | 3.1 | 2.7 | 2.4 | 2.1 | 1.9 | 1.8 | 1.6 | 1.5 | 1.3 | 1.2 | 1.1 | 1 | 0.9 | 0.8 | 0.8 | 0.7 | 0.6 | 0.6 | 0.5 | 0.5 | 0.4 | 0.4 | 0.4 | 0.3 | 0.3 | |
| 2 | 5.7 | 5.9 | 4.8 | 4.2 | 3.7 | 3.3 | 3 | 2.7 | 2.4 | 2.1 | 1.9 | 1.8 | 1.6 | 1.5 | 1.3 | 1.2 | 1.1 | 1 | 0.9 | 0.8 | 0.8 | 0.7 | 0.6 | 0.6 | 0.5 | 0.5 | 0.5 | 0.4 | 0.4 | | |
| 3 | 6.3 | 6.5 | 5.3 | 4.6 | 4.1 | 3.7 | 3.3 | 2.9 | 2.6 | 2.3 | 2.1 | 1.9 | 1.8 | 1.6 | 1.5 | 1.3 | 1.2 | 1.1 | 1 | 0.9 | 0.8 | 0.8 | 0.7 | 0.6 | 0.6 | 0.5 | 0.5 | 0.5 | | | |
| 4 | 6.9 | 7.1 | 5.8 | 5.1 | 4.5 | 4 | 3.7 | 3.2 | 2.9 | 2.6 | 2.3 | 2.1 | 1.9 | 1.8 | 1.6 | 1.5 | 1.3 | 1.2 | 1.1 | 1 | 0.9 | 0.8 | 0.8 | 0.7 | 0.6 | 0.6 | 0.5 | | | | |
| 5 | 7.5 | 7.8 | 6.4 | 5.6 | 5 | 4.4 | 4 | 3.6 | 3.1 | 2.8 | 2.6 | 2.3 | 2.1 | 1.9 | 1.8 | 1.6 | 1.5 | 1.3 | 1.2 | 1.1 | 1 | 0.9 | 0.8 | 0.8 | 0.7 | 0.6 | | | | | |
| 6 | 8.3 | 8.6 | 7 | 6.1 | 5.4 | 4.8 | 4.3 | 3.8 | 3.5 | 3.1 | 2.8 | 2.6 | 2.3 | 2.1 | 1.9 | 1.8 | 1.6 | 1.5 | 1.3 | 1.2 | 1.1 | 1 | 0.9 | 0.8 | 0.8 | | | | | | |
| 7 | 9.1 | 9.4 | 7.7 | 6.7 | 6 | 5.3 | 4.7 | 4.2 | 3.8 | 3.4 | 3.1 | 2.8 | 2.6 | 2.3 | 2.1 | 1.9 | 1.8 | 1.6 | 1.5 | 1.3 | 1.2 | 1.1 | 1 | 0.9 | | | | | | | |
| 8 | 10 | 8.4 | 7.4 | 6.6 | 5.8 | 5.2 | 4.6 | 4.1 | 3.7 | 3.4 | 3.1 | 2.8 | 2.6 | 2.3 | 2.1 | 1.9 | 1.8 | 1.6 | 1.5 | 1.3 | 1.2 | 1.1 | 1 | | | | | | | | |
| 9 | 11 | 9.3 | 8.1 | 7.2 | 6.4 | 5.7 | 5 | 4.5 | 4.1 | 3.7 | 3.4 | 3.1 | 2.8 | 2.6 | 2.3 | 2.1 | 1.9 | 1.8 | 1.6 | 1.5 | 1.3 | 1.2 | | | | | | | | | |
| 10 | 12 | 10 | 8.9 | 7.9 | 7 | 6.2 | 5.5 | 4.9 | 4.5 | 4.1 | 3.7 | 3.4 | 3.1 | 2.8 | 2.6 | 2.3 | 2.1 | 1.9 | 1.8 | 1.6 | 1.5 | | | | | | | | | | |
| 11 | 13 | 11 | 9.8 | 8.7 | 7.7 | 6.8 | 6.1 | 5.4 | 4.9 | 4.5 | 4.1 | 3.7 | 3.4 | 3.1 | 2.8 | 2.6 | 2.3 | 2.1 | 1.9 | 1.8 | | | | | | | | | | | |
| 12 | 15 | 12 | 11 | 9.5 | 8.5 | 7.5 | 6.7 | 5.9 | 5.4 | 4.9 | 4.5 | 4.1 | 3.7 | 3.4 | 3.1 | 2.8 | 2.6 | 2.3 | 2.1 | | | | | | | | | | | | |
| 13 | 16 | 13 | 12 | 11 | 9.3 | 8.3 | 7.3 | 6.5 | 5.9 | 5.4 | 4.9 | 4.5 | 4.1 | 3.7 | 3.4 | 3.1 | 2.8 | 2.6 | | | | | | | | | | | | | |
| 14 | 18 | 15 | 13 | 12 | 10 | 9.1 | 8 | 7.1 | 6.5 | 5.9 | 5.4 | 4.9 | 4.5 | 4.1 | 3.7 | 3.4 | 3.1 | | | | | | | | | | | | | | |
| 15 | 19 | 16 | 14 | 13 | 11 | 10 | 8.8 | 7.8 | 7.1 | 6.5 | 5.9 | 5.4 | 4.9 | 4.5 | 4.1 | 3.7 | | | | | | | | | | | | | | | |
| 16 | 21 | 18 | 16 | 14 | 12 | 11 | 9.7 | 8.6 | 7.8 | 7.1 | 6.5 | 5.9 | 5.4 | 4.9 | 4.5 | | | | | | | | | | | | | | | | |
| 17 | 23 | 20 | 17 | 15 | 14 | 12 | 11 | 9.5 | 8.6 | 7.8 | 7.1 | 6.5 | 5.9 | 5.4 | 4.9 | | | | | | | | | | | | | | | | |
| 18 | 25 | 22 | 19 | 17 | 15 | 13 | 12 | 11 | 9.5 | 8.6 | 7.8 | 7.1 | 6.5 | 5.9 | | | | | | | | | | | | | | | | | |
| 19 | 28 | 24 | 21 | 18 | 16 | 14 | 13 | 11 | 10 | 9.5 | 8.6 | 7.8 | 7.1 | | | | | | | | | | | | | | | | | | |
| 20 | 31 | 26 | 23 | 20 | 18 | 16 | 14 | 13 | 11 | 10 | 9.5 | 8.6 | | | | | | | | | | | | | | | | | | | |
| 21 | 34 | 29 | 25 | 22 | 20 | 17 | 15 | 14 | 13 | 11 | 10 | | | | | | | | | | | | | | | | | | | | |
| 22 | 37 | 31 | 27 | 24 | 22 | 19 | 17 | 15 | 14 | 13 | | | | | | | | | | | | | | | | | | | | | |
| 23 | 41 | 34 | 30 | 27 | 24 | 21 | 19 | 17 | 16 | | | | | | | | | | | | | | | | | | | | | | |
| 24 | 45 | 38 | 33 | 29 | 26 | 24 | 22 | 20 | | | | | | | | | | | | | | | | | | | | | | | |
| 25 | 49 | 41 | 36 | 32 | 29 | 25 | 22 | | | | | | | | | | | | | | | | | | | | | | | | |
| 26 | 54 | 46 | 40 | 35 | 31 | 28 | | | | | | | | | | | | | | | | | | | | | | | | | |
| 27 | 59 | 50 | 44 | 39 | 34 | 31 | | | | | | | | | | | | | | | | | | | | | | | | | |
| 28 | 65 | 55 | 48 | 43 | 38 | 34 | | | | | | | | | | | | | | | | | | | | | | | | | |
| 29 | 71 | 74 | 60 | 53 | 47 | 42 | 37 | | | | | | | | | | | | | | | | | | | | | | | | |
| 30 | 78 | 81 | 66 | 58 | 51 | 46 | 41 | | | | | | | | | | | | | | | | | | | | | | | | |

46 Net Present Value

93 Non-distributable Interest necessary to attain corpus future value of $139 million (gray squares)

768 Future Value of $46 after 30 years

139 Sum of Present Mineral Incomes

630 Distributable Interest to spend on schoolchildren (white squares)

**Interest**

| Interest | 73 | 75 | 61 | 53 | 46 | 41 | 36 | 31 | 27 | 25 | 22 | 20 | 17 | 16 | 14 | 12 | 11 | 9.3 | 8 | 6.9 | 5.9 | 5 | 4.1 | 3.4 | 2.7 | 2 | 1.4 | 0.9 | 0.4 | 0 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Interest Rate: 0.0981

Justice James C. Nelson dissents.

¶70    I dissent from our decision. I would hold that the commingling of school trust distributable revenues with the General Fund is a *per se* breach of the State's fiduciary duties under the Montana Constitution and the Enabling Act. I would also hold that the "scheme"--and I do not use that term lightly--enacted as a result of SB 495 is a violation of the State's duties to preserve the school trust as required by the Montana Constitution and the Enabling Act. I would, accordingly, reverse.

¶71    We discussed at length the State's school trust responsibilities under our Constitution and under the Enabling Act in *Montrust I,* ¶¶ 13-17. I am not going to repeat that analysis here. I do note, however, that in its gloss-over of the responsibilities and duties we articulated in that decision, the Court has lowered the bar significantly as far as the State's school trust trustee obligations are concerned. It is, indeed, shocking that this Court now approves the commingling of school trust distributable revenues with the General Fund with a "no harm, no foul" wink of the eye. It is equally indefensible that the Court justifies a "scheme" which robs Peter (future generations of school children) to pay Paul (present day school children) and holds that scheme is constitutional.

### *"No Harm, No Foul"*

¶72    It is undisputed that distributable revenue from the school trust was commingled in the General Fund. In justifying this practice, the Court takes the simplistic position that as long as the schools are distributed more from the General Fund than the interest income and bonuses put into the Fund, then the schools can prove no financial damage--"no harm, no foul." The Court's analysis misses the mark completely.

33

¶73    The fallacy in its approach is that the Court chooses to hold the State, in its capacity as a trustee of the school trust, to a lower standard than is enunciated in Montana's trust law. As we stated in *Montrust I*, ¶ 14, the State is in fact a *trustee* of the school trust. Here, the State has failed to demonstrate that it is not bound by the same strict fiduciary obligations, duties and responsibilities that bind all trustees under Montana law. Nonetheless, the Court, without citing legal authority, concludes that this State's trust law fades into insignificance when the State of Montana takes on the mantle of trustee.

¶74    Moreover, the Court's analysis rings hollow. The Court frames Issue One as a question of whether the State has breached its duties. However, the Court then proceeds to essentially consider the mere issue of whether harm has occurred. The trouble with this approach, of course, is that the issue of whether harm has occurred does not settle the questions regarding the legal duties at issue here. In other words, a violation of a legal duty is not stripped of all legal import or rendered nonexistent simply because, arguably, no harm has occurred consequent to that violation.

¶75    One of the most fundamental duties of a trustee is to keep clear and precise records to the end that the trustee is able to render routine, accurate accountings to the beneficiaries of the trust--here, Montana's schools and school children. Sections 72-34-124 to -126, MCA.

¶76    In specific contravention to the State's commingling of school trust distributable revenues and the General Fund, § 72-34-110, MCA, mandates:

> The trustee has a duty to do the following:
>     (1) to keep the trust property separate from other property not subject to the trust; and

34

(2) to see that the trust property is designated as property of the trust.

¶77  This statutory requirement is echoed by the treatises and by the commentators.  The Restatement (Second) of Trusts provides:

> The trustee is under a duty to the beneficiary to keep the trust property separate from his individual property, and, so far as it is reasonable that he should do so, to keep it separate from other property not subject to the trust, and to see that the property is designated as property of the trust.

Restatement (Second) of Trusts § 179 (1959).  Moreover, as is required by the blackletter law of Montana, the trustee

> must render an accounting when called on to do so at reasonable times by the beneficiaries.  Where there are several beneficiaries, any one of them can compel an accounting by the trustee.

William F. Fratcher, Scott on Trusts § 172 (4th ed. 1987).  Likewise, Professor Bogert states that the trustee

> "is bound to keep clear and accurate accounts, and if he does not the presumptions are all against him, obscurities and doubts being resolved adversely to him."

George G. Bogert & George T. Bogert, The Law of Trusts and Trustees § 962 (rev. 2d ed. 1983) (citation omitted) (hereinafter Bogert on Trusts).

¶78  Clearly, these statutes which are applicable to all Montana trustees, as well as these secondary authorities, forbid commingling of trust revenues with non-trust funds.  The trustee must segregate trust and non-trust revenues and property, and must be able to precisely account between the two.

¶79  Yet, in the case *sub judice,* the Court gives the State, acting through the Board of Land Commissioners, a legal bye.  The State, in its school trust trustee capacity, does not

have to segregate trust distributable revenues from General Fund funds; the State does not have to see that the trust income is designated as property of the trust; the State does not have to keep clear accounts of trust versus non-trust income; nor does the State have to render to the trust beneficiaries accurate accountings of trust versus non-trust income.

¶80     Indeed, here, the trial judge had to concede that the State could not fulfill these most basic fiduciary obligations.  As the trial judge stated, "[n]one of the witnesses who testified at trial knew where the trust's income has been or presently is deposited."  Having reached that damning conclusion, the court then went on to the analysis upon which this Court seizes:

> However, the evidence established that the legislative appropriation to the schools has far exceeded any interest earned from the trust corpus. MonTRUST has failed to prove financial harm to the beneficiaries of the school trust on this basis.

"No harm, no foul."

¶81     There are some very practical reasons for the rule against commingling.  First, a trustee which commingles its property with that of the trust may be tempted to use trust property as its own for non-trust purposes.  Second, where--as here--money cannot be tracked, beneficiaries are frustrated in their attempts to police trust management. Consequently, those who would take advantage of the beneficiary and the commingled funds are in a better position to do so.  Third, when trust funds are commingled, there is an increased risk that revenues and assets properly belonging to the trust will be improperly alienated to third parties.[5]

---

[5]  Professor Bogert cites these reasons in his discussion of the rule requiring trustees to "earmark" trust property.  *See* Bogert on Trusts § 596.  However, these reasons

36

¶82    In the case at bar, the trial court, and now this Court, have abrogated the State's obligation to accurately segregate and account for school trust distributable revenues and have, thus, subjected these revenues to the harms mentioned above.

¶83    Commingling is a *per se* breach of the State's statutory fiduciary obligations as the school trust trustee.  Section 72-34-110, MCA.  I can not agree with the Court's "no harm, no foul" analysis.  It is absolutely contrary to Montana trust law.  Accordingly, I dissent as to Issue One and would reverse.

### *Rob Peter to Pay Paul*

¶84    Similarly, I dissent as to Issue Two.

> I have some good news and some bad news.  The good news is that the people who wrote and adopted our Enabling Act and our Constitution wisely established an inviolate trust fund to help defray the cost of the free quality public education that Montana's children are guaranteed.  The bad news is that the 2001 Legislature concocted a scheme to siphon off money from the trust and now it's over $94 million short.

State Superintendent of Public Instruction, State of Education Address to the 2031 Legislature.

¶85    Despite the Court's attempt to put the best spin possible on SB 495, the uncontroverted evidence is that on June 30, 2031, the trust corpus will have increased to $51,158,382, under the 2001 law, whereas under pre-2001 law the trust corpus would have increased to $145,854,146--a net loss to the trust corpus of $94,695,764.

---

are applicable as well to the rule against commingling, which Bogert also discusses at § 596.

¶86 The SB 495 scheme--simplified--was to authorize the Department of Natural Resources and Conservation, on behalf of the distributable trust fund, to "purchase" future "mineral production rights"--i.e., royalties--from the permanent fund. The purchase was funded by, what turned out to be, a $46,366,904 loan from the Coal Trust Fund. The mineral royalties so "purchased" would be used to service the loan and would be distributed to the school trust fund. No customary documents for the sale of mineral rights or transfer of leases were executed. Rather, the Land Board conveyed a "cumulative revenue stream" of mineral royalties equal to $138,894,596.

¶87 The Legislature was not advised in the fiscal note to SB 495 that Board of Investments estimates revealed that after fiscal year 2012 schools would get less trust income each year as a result of SB 495; that over the term of the deal, school revenues would be some $13.5 million less than before SB 495; and that, as already noted, the permanent trust corpus would be depleted permanently by over $94.6 million.

¶88 Why exactly this is such a great deal for the school trust escapes any rational explanation. It does allow the Legislature the rob Peter (future school children) to pay Paul (present school children), thereby decreasing the Legislature's obligation to adequately fund education currently under Article X, Section 1(3), of the Montana Constitution. But this short-sighted shell game does nothing for future generations of Montana's school children.

¶89 More to the point, while this sort of financial chicanery may have been acceptable in the heady days of Enron-style accounting, it is unacceptable for the State as the trustee of the "inviolate" school trust described in Article X, Section 3 of the Montana Constitution.

Specifically, this constitutional provision requires that "[t]he public school fund shall forever remain inviolate, guaranteed by the state against loss or diversion." This unambiguous requirement that the public school fund forever remain "inviolate" means that it must forever remain "free from violation;" it must "not [be] broken, infringed or impaired." Black's Law Dictionary 846 (8th ed. 2004). Allowing the trust fund to be dissipated by over $94.6 million in a thirty year period clearly violates the inviolability mandate of our Constitution. How much more impairment is the legislature willing to authorize and this Court willing to approve?

¶90 SB 495 also violates the Enabling Act. Minerals are part of the land--they are a real property interest. *Carbon County v. Union Reserve Coal Co., Inc.* (1995), 271 Mont. 459, 473, 898 P.2d 680, 688. Income from the extraction of minerals--i.e., royalties--represent an income interest. *Stanford v. Rosebud County* (1991), 251 Mont. 128, 136, 822 P.2d 1074, 1079; *Stokes v. Tutvet* (1958), 134 Mont. 250, 257, 328 P.2d 1096, 1100. This income becomes part of the trust "corpus" of the land trust, as Section 11 of the Enabling Act provides that

> the proceeds from the sale and other permanent disposition of any of the said [school trust] lands and from every part thereof, shall constitute permanent funds for the support and maintenance of the public schools and the various state institutions for which the lands have been granted.

¶91 The "stream of mineral royalties" is purely and simply the income, or "proceeds," from the future sale of trust minerals. As already noted, once minerals are extracted, that portion of the trust corpus formerly comprised by the mineral, or "real" estate, is replaced by a non-real or "income" interest. Royalties are principal under a land trust. That income

39

interest belongs to and becomes part of the trust corpus. However, under SB 495, the trust corpus is permanently dissipated by over $94.6 million by 2031. And this leads to the next violation of the State's fiduciary duties as the school trust trustee.

¶92    Besides refraining from commingling trust and non-trust income, another fundamental fiduciary obligation of a trustee under Montana law is the duty to preserve the corpus of the trust. Again, the blackletter trust law of Montana provides:

> The trustee has a duty to take reasonable steps under the circumstances to take and keep control of *and to preserve the trust property*.

Section 72-34-107, MCA (emphasis added). *See also* Bogert on Trusts § 582; Restatement (Second) of Trusts § 176 (1959).

¶93    In the management of a trust, it is a breach of the trustee's fiduciary obligations to favor present beneficiaries over future beneficiaries by dissipating the trust corpus. *See State ex rel. Haire v. Rice* (1906), 33 Mont. 365, 385-86, 83 P. 874, 876; Restatement (Second) of Trusts § 233 (1959). Yet, this is exactly what SB 495 mandates--the permanent dissipation of the school trust corpus over a period of thirty years by in excess of $94.6 million. Future generations of Montana school children deserve better management of their trust from their trustee. Future generations deserve the benefit of the full trust corpus--not a depleted one.

¶94    In short, under the blackletter law and under secondary authorities, this failure to preserve the school trust corpus is also a *per se* breach of the State's fiduciary obligations and duties as the school trust trustee.

¶95     As it did in resolving Issue One, the Court, in putting its stamp of approval on the SB 495 scheme, abrogates yet another fundamental duty of the State as the school trust trustee--the duty to preserve the trust corpus.  I can not agree, and again, I would reverse.

¶96     In summary, holding the State as the school trust trustee to a "no harm, no foul" standard in its commingling of distributable trust revenues and the General Fund, and allowing the trustee to rob Peter to pay Paul by dissipating the school trust corpus, is shocking.  That the Legislature enacted legislation that  is violative of the Enabling Act and our Constitution is bad enough; that our court system has upheld it, is inexcusable.

¶97     And the public wonders why the funding of our educational system is in such a mess!

¶98     I dissent.

/S/ JAMES C. NELSON

Justice Patricia O. Cotter joins in the dissent of Justice James C. Nelson.

/S/ PATRICIA O. COTTER