STATE EX REL. RICHARD J. THOMPSON, PETITIONER AND APPELLANT, *v.* TIM BABCOCK, HARRIET MILLER, FRANK MURRAY, FORREST H. ANDERSON AND THE STATE BOARD OF LAND COMMISSIONERS OF THE STATE OF MONTANA, RESPONDENTS AND RESPONDENTS.

No. 10859.
Submitted December 1, 1965. Decided January 12, 1966.
See also 145 Mont. 592, 403 P.2d 605.
409 P.2d 808.

Hubert J. Massman (argued), Helena, for appellant.

Forrest H. Anderson, Atty. Gen., Louis Forsell (argued), Helena, for respondents.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal by petitioner, Richard J. Thompson, from an order denying a new trial after an alternative writ of mandate had been vacated. The action was presented to the district court on an agreed statement of facts, from which the court drew its own findings of fact and conclusions of law.

The State of Montana is the owner of certain farm lands situated in Pondera County. These lands are under the control, direction and management of the respondents, the State Board of Land Commissioners. It is the Board's statutory duty under section 81-103, R.C.M.1947, to hold these, and all state lands, in trust for the "support of education, and for the attainment of other worthy objects helpful to the well being of the people of this state * * *." Moreover, the respondents are "so to administer this trust as to secure the largest measure of legitimate and reasonable advantage to the state."

During 1954 to 1959 the lands in question were leased to John Woods and Loren Warwick, hereinafter referred to as the lessees, for twenty-five percent of the crop share. The same lessees held the lands in 1960 and 1961 at fifty percent crop share. The same individuals leased the land for fifty-five percent crop share during 1962. At the time of renewal of the lease, in January of 1963, after notice of consideration by the State Board of competitive bids, six applications for a lease were received by the Board. The petitioner's bid of fifty percent was the highest, with the lessees' bid of thirty-three and one-third percent the lowest.

Pursuant to statute, the Board notified the lessees that a fifty percent bid had been received, and that they were entitled to meet it. The lessee, however, requested to appear before the

Board. In making their appearance, on February 27, 1963, financial statements were presented which indicated Woods and Warwick were losing money at their former lease arrangements. There were also statements from accountants and bankers to the effect that in this part of the state it was impossible to make money with a fifty percent share bid. None of the statements were taken under oath, nor were they recorded verbatim. It was noted at the appearance that the *petitioner here had no other land.*

No notices to any prospective lessees were issued which would indicate the Board was going to consider the questioned lease, nor was any evidence to support the other applications solicited. The petitioner, however did attend this meeting, and did make a statement. At the conclusion of the hearing the Board took the matter under advisement for further investigation.

On March 13, 1963, the bid of Woods and Warwick was accepted and their old lease renewed. The petitioner demanded its revocation, which was denied by the Board. The following reasons were stated:

"In the approval or disapproval of bids, we do not act in a ministerial capacity. We are expected to exercise discretion. As trustees of school lands, our duty is to obtain a sustained income in the management of the land. Evidence presented to this Board showed that a 50 percent bid was considerably higher than the usual landlord's share prevailing in this area. To obtain a sustained income and insure good husbandry practices we must have a qualified lessee who will complete the term. If a competing bid is considerably higher, there is danger that the lessee will not fulfill his term because of inability to make money or that he will cut corners on good husbandry practice. In the meantime, the qualified proven farmer may have gone out of business or left the area. As trustees charged with managing this land in a prudent careful manner, I do not believe we can take these risks."

Then petitioner filed, on April 10, 1963, a petition in the Dis-

trict Court seeking a writ of mandamus to compel the Board to invalidate its lease to lessees Woods and Warwick and to issue a lease to petitioner. An alternative writ issued and was met by a motion to quash on the grounds that the petition failed to state a claim for relief in mandamus and further that the respondent State Board lacked the power to perform the command of the alternative writ, namely, cancellation of an existing lease. The trial court granted the motion to quash the alternative writ and an agreed statement of facts was submitted. The trial court made its own findings and conclusions and dismissed the action.

Appellant cites as error the lower court's order vacating the alternative writ of mandate, and denying his petition for a new trial.

It is axiomatic that an action already done may not be undone by mandamus. It lies only to compel the performance of an act, section 93-9102, R.C.M.1947, not to correct errors. "The writ of mandamus is used to stimulate action pursuant to some legal duty and not to cause the respondent to undo action already taken, or to correct or revise such action, however erroneous, it may have been." 34 Am.Jur., Mandamus, § 8, p. 813 (1941). The same rule is employed by Montana. In State v. State Board of Equalization, 56 Mont. 413, 450, 454, 185 P. 708, 186 P. 697, 699 (1920), it was stated, "The court could compel action * * * but, having proceeded in the matter, exercising its own judgment and discretion, in the absence of any statutory provision directing how the board shall proceed, and in the absence of fraud or what amounts to fraudulent action, the court is powerless to compel the board to proceed in any particular manner in arriving at its conclusion or to reverse its decision. The writ of *mandamus* is not a writ to correct errors, but to compel action. [Citing cases.]"

The same circumstances are in existence in this case. The Board has already acted, using its own judgment and discretion, and there is no fraud involved.

Thus, the petitioner has misconceived his remedy. A writ of certiorari might have been a more appropriate legal tool, although it does not provide for attorney's fees as does mandamus (under R.C.M.1947, § 93-9112) which may account for the latter's continued popularity among lawyers.

The trial court was correct, therefore, and this Court need go no further in denying relief. However, because of public policy involved this court desires to consider several of appellant's questions.

The questions may be simply denominated as follows: (1) Does the Board only act in a ministerial capacity when granting a lease; (2) in granting a lease does the Board have a large discretionary power; and (3) was such power, if available at all, abused in the instant case?

There is no doubt that the State Board of Land Commissioners has considerable discretionary power when dealing with the disposition of an interest in land they hold in trust for the people of this state. Section 81-103, R.C.M.1947, indicates, "The enumeration in this act of specific powers conferred upon the board shall not be so construed as to deprive the board of other powers not enumerated but inherent in the general and discretionary powers conferred by the constitution, and necessary for the proper discharge of its duties; but there can be no such implied powers inconsistent with any part of the constitution, nor shall any inherent powers be assumed to exist which would be inconsistent with any statutory provision or with the general rule and principle herein stated." If the "largest measure of legitimate and reasonable advantage" from the use of state lands is to accrue to the state, then the State Land Board must, necessarily, have a large discretionary power. Every facet of the Board's action cannot, and is not, explicitly laid out in the statutes or State Constitution. This view was confirmed by Justice Sanner in State ex rel. Gravely v. Stewart, 48 Mont. 347, 349, 137 P. 854, 855 (1913), where he said, "The grant of lands for school purposes by the federal government

to this state constitutes a trust [Citing cases.] and the state board of land commissioners, as the instrumentality created to administer that trust, is bound, upon principles that are elementary, to so administer it as to secure the largest measure of legitimate advantage to the beneficiary of it. To that end, and of necessity, the board must have a *large discretionary power over the subject of the trust;* and therefore it has been expressly given 'the direction, control, leasing and sale' of these lands, under such regulations and restrictions as may be prescribed by law. Constitution, art. 11, § 4." (Emphasis added.) See also Leuthold v. Brandjord, 100 Mont. 96, 106, 47 P.2d 41 (1935).

It appears obvious that if such a "large discretionary power" exists, then the granting of a lease may not be considered only ministerial in nature.

The discretionary power of the Board is, however, limited. Section 81-103, cited above, indicates the principal restriction on the power of the Board. Article XVII, § 1 of the Montana Constitution provides another. A portion of such section reads: "* * * and none of such land, nor any estate or interest therein, shall ever be disposed of except in pursuance of general laws providing for such disposition, nor unless the full *market value* of the estate or interest disposed of, to be ascertained in such manner as may be provided by law, be paid or safely secured to the state." (Emphasis supplied.) In Rider v. Cooney, 94 Mont. 295, 308, 23 P.2d 261, 263 (1933), it was held that the "leasing of the lands of the state for a term of years is the disposal of an interest or estate in the lands within the provisions of our Constitution." This being the case it is incumbent upon the Board to secure the full market value for the lease.

In deciding what the full market value for a lease is, the usual "willing buyer—willing seller" test has little application. A more appropriate test is the value of a similar lease in the particular community. The factor of the community value of the lease should be coupled with the applicant's ability as a

farmer, as well as other necessary variables which would have to be viewed in order for the state to secure as large a return as possible, yet preserving the productive capacity of the land. It must be remembered that the leasing of agricultural land is to be done only on a crop share rental basis, except in unusual cases. Section 81-402, R.C.M.1947.

A search of the cases and statutes does not indicate a requirement for letting an agricultural lease through the use of a public bidding arrangement. Quite the contrary implication seems to be evident. The case of Toomey v. State Board of Land Commissioners, 106 Mont. 547, 561, 81 P.2d 407, 415 (1938), although dealing with the *sale* of an oil or gas interest in state lands, stated: "* * * when an estate or interest in lands is sold, as distinguished from the land itself, there need not be a public sale and advertising unless the Legislature so directs. In other words, when there is a sale of only an estate or interest in such lands, the Legislature is given ample power to determine the method by which to ascertain the full market value of the estate or interest." Thus if the *sale* of an interest in land need not be public, there is no reason a simple lease need be let at a public bidding. Further a close reading of Title 81, Chapter 4, R.C.M.1947, gives no indication that a public notice of any hearing, is required, or that a public hearing is at all necessary, regarding the Land Board's action on a lease. If such public hearing were necessary it would quite likely become the case that the Board's efficiency would be totally destroyed.

The applicant makes considerable note of the fact both in his brief and oral arguments that the Board's action made a sham of the competitive bidding process. Whether the employment of competitive bidding is a necessity when there is a letting of an agricultural lease might be questioned, as the Legislature has not made this point plain. Also, where an agricultural lease is involved, there is not available the usual "biddable factor" which is found in the normal bid circum-

stance. That is, there is not an established foundation from which the bid may be made as is found, for example, where a timber sale is concerned. The biddable factor of timber is generally a rather standard stumpage rate arising out of the present value of lumber in the competitive market, while here one is dealing with a percentage of crop production which varies considerably with the character and nature of the individual farmer. As a result, the Board is forced to use discretion when dealing with such a bid if it is to meet all its required duties. The procedure used might be called, for lack of a more erudite term, quasi competitive bidding.

■ The State Board of Land Commissioners are the trustees of state lands. As such they owe a higher duty to the public than does an ordinary businessman. Therefore, they may not speculate as to the possibility of receiving a higher return for leased land, but must secure a "sustained income" (section 81-401) which will continually benefit the public in general.

■ When state land is leased, the state does not relinquish the entire interest therein, thus it is the Board's duty to get the best lessees possible, so the state may receive the maximum return with the least injury occurring to the land.

The requirement of receiving a sustained income, coupled with the necessity of receiving full market value for any lease allowed, and the Board's duty to the public puts the Board in an awkward position when faced by a set of factors such as these presently under consideration. It is in a circumstance such as this when the discretionary power of the Board must come into full play.

In the instant case it appeared that a fifty percent crop share bid was unrealistic for this section of the country, and that the state might lose money if such a lease was allowed. The Board, as a result, had to view all factors in the light of the proposed lessee, the market value of the lease in the general area, the nature of the land and their duty to the public. As a result a determination was made which indicated the fullest market

value of the lease, for the best profit available to the state, was the bid made by Woods and Warwick. The Land Board had had experience with Woods and Warwick since 1954 at 25 percent crop share, 50 percent share, 55 percent share on short term leases and now chose a 33⅓ percent share on a longer ten-year lease.

Significantly, the Board minutes reflect that petitioner, appellant here, *owned no other land.* Subsequently, after appeal in this case, petitioner moved this court to remand the matter to the district court on the grounds of newly discovered evidence. As put in the supporting affidavit, "the action of the respondent Board in fact constituted a finding that the relator and appellant herein was not a qualified lessee * * *." The so-called new evidence was that petitioner was now an assignee of a lease of state land some three miles distant and would now be a qualified bidder.

While the Board's action was not grounded on the issue of qualification of the petitioner as a bidder alone, it does indicate that insofar as this particular bidder was concerned the Board did exercise discretion.

The final determination was not reached arbitrarily nor capriciously. Neither does it make a mockery of what we call quasi competitive bidding, when one reviews carefully the duty of the Board to the public.

We do wonder, however, about the Board's cavalier dismissal of the other four bidders. There is no mention of them in their record of meetings. There is no indication why some bid between thirty-three and one third and fifty percent crop share would not have been of better value to the state than the one received. It might well have been that the Board's action would, in a proper case, have been viewed in a different light as to sound discretion if any other bidder had questioned the lease allowed. In the future, if the Board is to follow a procedure similar to what occurred here, it is suggested a more detailed record be maintained for the benefit of all parties involved. R.C.M.1947, § 81-104, requires "complete minutes."

56

 Further, it should be fully realized that this decision does not preclude the application of section 81-405, as to preference rights. If the quality of the bidders are similar, and if the crop share bid is within range of the market value of the particular lease as far as the standard of the community is concerned, then the procedure of section 81-405 must be followed. However, if, as in the present case, there is considerable discrepancy in the bids as well as the character of the bidder, then the Board must utilize its discretion to determine what will most benefit the public.

We are not to be understood, however, as approving the informality of proceedings here; nor, in fairness to all bidders, the lack of notice and opportunity to be heard, once the Board has, as here, initiated the preference bid matching procedure as provided in section 81-405.

Having determined that the district court properly vacated the writ of mandate, the order appealed from is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES JOHN C. HARRISON, DOYLE and ADAIR concur.