No. 04-862

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 351

FRIENDS OF THE WILD SWAN, a
Montana Nonprofit Corporation,

        Plaintiff and Appellant,

   v.

DEPARTMENT OF NATURAL RESOURCES
AND CONSERVATION, and MONTANA
BOARD OF LAND COMMISSIONERS,

        Defendants and Respondents.

APPEAL FROM:    The District Court of the First Judicial District,
                    In and For the County of Lewis and Clark, Cause No. BDV-2003-527,
                    Honorable Jeffrey M. Sherlock, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              Andrew J. Nelson, Smith & Thiel Law Offices, Missoula, Montana

              Timothy Bechtold, Rossbach Hart Bechtold P.C., Missoula, Montana

       For Respondents:

              Tommy Butler and Mark Phares, Special Assistant Attorneys General,
              Department of Natural Resources and Conservation, Helena, Montana

                    Submitted on Briefs:  July 13, 2005

                           Decided:  December 29, 2005

Filed:

             _____
                           Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Appellant Friends of the Wild Swan appeals from the order of the First Judicial District Court granting summary judgment in favor of Respondents Department of Natural Resources and Conservation and the Board of Land Commissioners. We affirm.

¶2 We restate the issue on appeal as follows:

¶3 Does § 77-1-202, MCA, require the Board of Land Commissioners to conduct a harvest-level financial accounting when considering a proposed timber sale on school trust lands?

BACKGROUND

¶4 In 2003, the Montana Department of Natural Resources and Conservation (DNRC) selected one of three alternatives set forth in a Final Environmental Impact Statement on logging in the Swan River State Forest. The selected alternative, "Alternative C," proposed harvesting 10.2 million board feet in three phases from a parcel of school trust lands known today as the Goat Squeezer Project Area. The purpose of the harvest was to generate funds for the Montana public schools as well as to promote timber stand health and vigor. DNRC submitted the proposed timber harvest and sale to the Montana Board of Land Commissioners (Board) as required, and the Board approved the harvest and sale on July 21, 2003. In approving the proposal, the Board did not conduct a harvest-level accounting of the timber sale. Instead, the Board specifically evaluates costs and benefits at the programmatic, or year-end, level only.

¶5     Friends of the Wild Swan (FOWS), a nonprofit environmental group, challenged the Board's methodology in evaluating timber sale transactions in the District Court, arguing that § 77-1-202, MCA (2003) (henceforth § 77-1-202, MCA)[1] required harvest-specific accountings. The District Court, however, rejected that challenge and granted summary judgment to the Respondents. FOWS appealed to this Court on November 10, 2004.

STANDARD OF REVIEW

¶6     In granting summary judgment, the District Court ruled as a matter of law that § 77-1-202, MCA, did not require the Board to reconcile timber-sale costs and benefits at the harvest-level. No factual disputes are identified, and we review the District Court's conclusions of law *de novo,* determining their correctness. *Steer, Inc. v. Department of Revenue* (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603.

DISCUSSION

¶7     The issue of whether § 77-1-202, MCA, requires harvest-level accounting was one of four issues addressed by the District Court and is the only substantive issue raised on appeal. The District Court concluded that no "statute, constitution, rule, regulation, or case

---

[1]The 2005 Legislature amended § 77-1-202(1), MCA, which now reads, in pertinent part:

The Board shall administer this trust to:
(a)   secure the largest measure of legitimate and reasonable advantage to the state; and
(b)   provide for the long-term financial support of education.

The amendments were effective July 1, 2005. FOWS brought this suit prior to that date, challenging the timber sale pursuant to the 2003 version of the statute. All future references to this section herein are to subsection (1) of the 2003 version of the statute.

3

law" required the State to perform such specific accountings. The District Court pointed to the year-end accounting requirements as well as to mandated calculations and reporting methodologies as indications that the Legislature never intended to require more specific accountings. It also relied on the Legislature's two-time rejection of bills which would have required harvest-level accounting in reaching its conclusion. *See* H.B. 605 (Mont. 2003), H.B. 576 (Mont. 2001). FOWS challenges that conclusion and asserts that the requirement of § 77-1-202, MCA, to "secure the largest measure of legitimate and reasonable advantage to the state" language is rendered meaningless without a harvest-level accounting requirement.

### *The Trust For Public Schools*

¶8    Under the Act of February 22, 1889 (the Enabling Act), the federal government granted Montana certain lands "for the support of common schools." Enabling Act, § 10. The grant of those lands created a trust for the people. *Montanans for the Responsible Use of the School Trust v. Board of Land Commissioners*, 1999 MT 263, ¶ 13, 296 Mont. 402, ¶ 13, 989 P.2d 800, ¶ 13 (*Montrust I*). Montana's first Constitution accepted the lands which were granted on the terms of the Enabling Act, recognizing that they were held in trust and that the State acted as trustee. *Montrust I*, ¶ 13. Finally, Montana's 1972 Constitution re-affirmed the land grant, the trust, and the terms of the Enabling Act. Art. X, Sec. 11, Mont. Const. (1972).

¶9    Pursuant to the Montana Constitution, the Board of Land Commissioners is directed to administer the trust and act as the accountable trustee. *See* Art. XI, Sec. 4, Mont. Const.

4

(1889); Art. X, Sec. 4, Mont. Const. (1972). To assist the Board in fulfilling its responsibility as trustee, the Legislature enacted Sec. 3, ch. 60, L. 1927, today § 77-1-202, MCA, which outlined the Board's obligations with regard to the language of the Enabling Act and the Montana Constitution. At the time this proceeding was initiated, the language outlining the trust responsibility had not changed in seventy years. It provided:

> In the exercise of these powers, the guiding principle is that these lands and funds are held in trust for the support of education and for the attainment of other worthy objects helpful to the well-being of the people of this state as provided in The Enabling Act. The board shall administer this trust to secure the largest measure of legitimate and reasonable advantage to the state.

Section 77-1-202, MCA.

### Deference to the Board

¶10    Initially, we note that the law affords discretion to the Board in its administration of the school land trust. In *State v. Babcock* (1966), 147 Mont. 46, 51, 409 P.2d 808, 811, we explained that "[T]he State Board of Land Commissioners has considerable discretionary power . . . . If the 'largest measure of legitimate and reasonable advantage' from the use of state lands is to accrue to the state, then the State Land Board must, necessarily, have a large discretionary power." We further explained that this power was "inherent in the general and discretionary powers conferred by the constitution, and necessary for the proper discharge of its duties . . . ." *Babcock*, 147 Mont. at 51, 409 P.2d at 811. Finally, we affirmed that discretion in *Montanans for the Responsible Use of the School Trust v. Darkenwald*, 2005 MT 190, 328 Mont. 105, 119 P.3d 27 (*Montrust II*), where, when faced with an evaluation of the Board's method of determining "fair market value," we stated, "we will not 'control

5

the discretion of the board unless it appears that the action of the board is arbitrarily and, in effect, fraudulent.'" *Montrust II*, ¶ 52 (citing *Toomey v. State Bd. of Land Comm'rs* (1938), 106 Mont. 547, 562, 81 P.2d 407, 415). This is not to say the Board has unfettered discretion, or that its discretion is unlimited. *Babcock*, 147 Mont. at 52, 409 P.2d at 811. However, it is clear that the Board's obligation as trustee is a complex one, that the obligation is governed by constitutional and statutory provisions which grant authority to the Board over the trust, and that these provisions grant "large" or "considerable" discretion to the Board in the performance of its duties.

¶11 In addition to the discretion granted to the Board as the administrator of the trust, the law entitles the Board, as a state agency, to "respectful consideration" of its "long and continued course of consistent interpretation" of § 77-1-202, MCA, which it has administered for many years. *Montana Power Co. v. Public Service Comm.*, 2001 MT 102, ¶ 25, 305 Mont. 260, ¶ 25, 26 P.3d 91, ¶ 25. This consideration can be overcome by "compelling indications." *Montana Power*, ¶ 25; *see also Glendive Med. Ctr. v. Mont. Dep't of Public H.H.S.*, 2002 MT 131, ¶¶ 14-15, 310 Mont. 156, ¶¶ 14-15, 49 P.3d 560, ¶¶ 14-15.

***Does § 77-1-202, MCA, require the Board to conduct a harvest-level accounting when considering timber sales on school trust lands?***

¶12 FOWS argues that in order to fulfill the obligations under § 77-1-202, MCA, the Board must conduct a harvest-level accounting of every proposed trust-land timber sale before approving the project. In response, the Board argues that it fulfills its obligation under § 77-1-202, MCA, by conducting a program-wide accounting on a yearly basis, and

notes that there is no proof that it has ever failed to secure "the largest measure of legitimate and reasonable advantage." The question presented, therefore, is whether § 77-1-202, MCA, itself silent on accounting methodologies, requires the Board to conduct a harvest-level financial accounting.

¶13 As a matter of statutory interpretation, our goal is to ascertain the intent of the Legislature. *McCormick v. Brevig*, 2004 MT 179, ¶ 40, 322 Mont. 112, ¶ 40, 96 P.3d 697, ¶ 40; *see also* § 1-2-101, MCA. Our inquiry begins with the words of the statute itself: "The legislative intent is to be ascertained, in the first instance, from the plain meaning of the words used." *Western Energy Co. v. Dept. of Revenue*, 1999 MT 289, ¶ 11, 297 Mont. 55, ¶ 11, 990 P.2d 767, ¶ 11; *Brevig*, ¶ 40.

¶14 First, we observe that the plain language of the statute, set forth above, does not require such accountings. In fact, the statute on its face requires no accountings at all. Instead, the statute simply requires the Board to "secure the largest measure of legitimate and reasonable advantage to the state." Section 77-1-202, MCA. Of course, this Court may not "insert what has been omitted" when interpreting a statute. Section 1-2-101, MCA. This principle counsels against reading a specific accounting requirement into § 77-1-202, MCA.

¶15 However, FOWS argues that, despite the absence of an explicit requirement in the statute, we should reach a conclusion that the Board can fulfill its obligation to secure the largest measure of benefit to the state with regard to proposed timber sales only by conducting an accounting of all costs and benefits at the harvest level. FOWS reasons that

7

a "comprehensive economic evaluation" is "implicit in the plain language of the statute," particularly when the Board's fiduciary role with regard to school trust lands is considered.

¶16 FOWS's reference to the purposes which the Board must serve is not inappropriate. "We have many times stated that statutes must be read and considered in their entirety and the legislative intent may not be gained from the wording of any particular section or sentence, but only from a consideration of the whole." *State v. Heath*, 2004 MT 126, ¶ 27, 321 Mont. 280, ¶ 27, 90 P.3d 426, ¶ 27 (citing *Home Bldg. & Loan Ass'n of Helena v. Fulton* (1962), 141 Mont. 113, 115, 375 P.2d 312, 313). We are to give effect to all statutory provisions within a statutory scheme. Section 1-2-101, MCA. The process of reading relevant statutory schemes in their entireties is what allows the Court to give true effect to the will of the Legislature. *Dukes v. City of Missoula*, 2005 MT 196, ¶ 14, 328 Mont. 155, ¶ 14, 119 P.3d 61, ¶ 14. Above, we have set forth the underpinnings of the Board's trust obligation over school lands, and we now turn to the broader statutory structure governing that obligation.

¶17 While § 77-1-202 is itself silent about accounting obligations, there are provisions within the statutory scheme which illuminate the legislative intent regarding the Board's accounting obligations. Section 77-1-223, MCA, "Forest land report to trust beneficiaries –contents," and § 77-1-224, MCA, "Asset value and average return of revenue methods described," detail the Board's duties in reporting to trust beneficiaries, requiring yearly reports to the trust beneficiaries, and instructing how the trust assets must be valued. These statutes represent the Legislature's affirmative efforts to require the Board to account for

8

costs and profits in the timber-sale process. It is clear that the accounting required by §§ 77-1-223 and 77-1-224, MCA, does not include harvest-level reconciliation.

¶18 In light of the explicit accounting directives set forth in these statutes, we are hard pressed to conclude that the Legislature somehow meant to imply a more specific accounting requirement within § 77-1-202, MCA, as urged by FOWS. To do so, we would need to determine that the Legislature "implicitly" required an accounting by way of § 77-1-202, MCA, which is silent on the issue, despite the fact it explicitly addressed the Board's accounting requirements in other provisions of the same statutory scheme.

¶19 FOWS asserts that these other statutory accounting requirements are insufficient because they do not require the costs of individual sales, here the Goat Squeezer sale, to be calculated. It argues that, if the Board's "economic analysis is flawed or incomplete," the Board cannot demonstrate that it is securing the largest measure of legitimate and reasonable advantage.

¶20 This argument erroneously assumes that the "legitimate and reasonable advantage" which the Board must pursue is exclusively an economic one. While financial return is, without question, a vital purpose, it is not the Board's only goal. The law recognizes the unique nature of the Board's obligation to manage the school trust lands. Land trusts require maintenance efforts to ensure long-term sustainability, and the Board is thus forced to make "difficult to account for" decisions aimed at (1) ensuring long-term sustainability of school trust lands, while also (2) providing adequate resources to present beneficiaries. *See Babcock,* 147 Mont. at 53-54, 409 P.2d at 811; *see also* § 77-1-203, MCA. This duality of

9

purpose is unique in the context of land and resource management because it requires a trustee to consider more than just immediate financial benefit in its decision making. Indeed, one purpose of the Goat Squeezer sale was to promote timber-stand health.

¶21 Further in this regard, § 77-1-203, MCA, "Multiple Use Management," requires land management with the goal of promoting multiple purposes on the land, "so that . . . harmonious and coordinated management of the various resources, each with the other, will result without impairment of the productivity of the land . . . ." Section 77-1-203(1)(b), MCA. This statute evidences legislative recognition that in the context of trust land management, sustainable use and long-term forest health are important non-economic factors which the Board must also consider. Although the statutory directive to "secure the largest measure of legitimate and reasonable advantage" certainly includes economics, the phrase is not limited in purpose to financial return, thus undercutting FOWS's argument that there must be additional accounting efforts in order to comply with it.

¶22 We concede that additional information and analysis is always possible, and may very well be advantageous. Certainly, a limb by limb, tree by tree, or acre by acre accounting is theoretically possible in the context of a timber sale, and undoubtedly such accountings would help the Board in its evaluation of proposed timber sales. Indeed, one could envision many things which could be read into the language of "secure the largest benefit" that would aid in the performance of the Board's duties. Of course, at some level, additional analysis would probably be prohibitively expensive and counterproductive. The point, however, is that it is not the duty of this Court to decide what accounting measures would best serve the

10

Board in the fulfillment of its obligations.   Those are matters for the Board and the Legislature.

¶23     Given the lack of evidence to the contrary, we cannot conclude that the Board, in view of the multiple purposes it must fulfill with regard to school trust lands, the deference which the law provides in its administration of school trust lands, and current statutory accounting requirements, has not or cannot secure the largest measure of benefit without a harvest-level accounting of timber sales. Consequently, we conclude that such a requirement is not implicit within § 77-1-202, MCA.

### *Strict Accountability*

¶24     Finally, we address FOWS's brief argument that harvest-level accounting is required under § 77-1-202, MCA, by virtue of the "strict accountability" requirement of Article VIII, Section 12 of the Constitution, which provides:

> Strict accountability.  The legislature shall by law insure strict accountability of all revenue received and money spent by the state and counties, cities, towns, and all other local governmental entities.

¶25     Interpreting this provision, we have stated that "[t]he Constitution indicates that the strict accountability function is not self-executing." *Reep v. Board of County Commissioners* (1981), 191 Mont. 162, 169, 622 P.2d 685, 689.  The provision directs the legislature to implement the provision "by law," and, as such, it is up to the Legislature to create the statutory means which ensure "strict accountability."  In *Reep*, the Legislature, in the context of county government audits, required the Department of Community Affairs to conduct "comprehensive audits," instead of leaving that task to the county auditor.  *Reep*, 191 Mont.

11

at 169, 622 P.2d at 688-89. The effect of that decision was to recognize that the Legislature had significant discretion in creating a statutory scheme which satisfied the "strict accountability" mandate. *See also, Grossman v. State Dep't of Natural Res.* (1984), 209 Mont. 427, 464, 682 P.2d 1319, 1338 (holding that DNRC's issuance of coal tax severance bonds for water resource development did not violate the strict accountability requirement). Such discretion is necessary given the breadth and diversity of monies spent and received by various agencies of the State of Montana, and the peculiar accounting difficulties that may be faced in some agencies and not in others.

¶26 Here, the Legislature responded to the need for strict accountability by enacting, § 77-1-223, MCA, requiring annual detailed trust reports to all beneficiaries, and § 77-1-224, MCA, describing exactly how certain revenue must be calculated and reported to the beneficiaries. These provisions constitute the Legislature's effort to ensure accountability.

¶27 FOWS does not argue that these statutes are unconstitutional for failing to ensure "strict accountability." Instead, it appears to argue that § 77-1-202, MCA, must be read as requiring harvest-level accounting to give effect to the constitutional mandate for strict accountability. However, the Legislature clearly addressed "strict accountability" of trust revenues and administration costs by enacting the statutes addressed above. We cannot conclude that, in order to ensure strict accountability, a harvest-level accounting requirement must also be mandated.

### *Conclusion*

¶28     As the United States Supreme Court noted in *Chevron U.S.A. v. N.R.D.C.* (1984), 467 U.S. 837, 865, 104 S.Ct. 2779, 2793, 81 L.Ed.2d 694, 717, "judges are not experts in the field, and are not part of either political branch of the Government.  Courts must, in some cases, reconcile competing political interests, but not on the basis of the judges' personal policy preferences."  It may be easy to second-guess the Board's approach of conducting programmatic review of timber sales and the Legislature's two-time rejection of bills requiring harvest-level accounting of timber sales.  However, the question here is not whether more specific accounting is preferable or even desirable.  Rather, the question is whether harvest-level accounting of proposed timber sales is required by law.  After review of the Enabling Act, the Montana Constitution, and the statutory scheme, we conclude that the Board is not required by law to conduct harvest-level review of timber sales.  Therefore, we conclude that the Board is not in violation of § 77-1-202, MCA, when it forgoes harvest-level financial reconciliation. Consequently, the request of FOWS for attorney fees is also denied.

¶29     Affirmed.

/S/ JIM RICE

We Concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ BRIAN MORRIS


Justice Brian Morris concurs.

13

¶30    I concur in the conclusion reached by Judge Sherlock and this Court on appeal that nothing in the plain language of § 77-1-202, MCA, requires the Board of Land Commissioners to conduct a harvest-level financial accounting when considering a proposed timber sale on public trust lands. I write separately, however, to reiterate several points from our decision in *Montanans for School Trust v. Darkenwald*, 2005 MT 190, 328 Mont 105, 119 P.3d 27 (*Montrust II*), that bear on the outcome here.

¶31    As the Court points out in ¶ 22, many things could be read into the language of "secure the largest benefit" of § 77-1-202, MCA, that would aid in the performance of the Board's duties in managing school trust lands. We noted in *Montrust II* that the Board's discretionary authority to "secure the largest benefit" potentially countenances accepting lease terms less than the highest bid in order to effectuate sustained yield concepts and ensure the long term strength of the trust corpus. *Montrust II*, ¶ 56, citing *State v. Babcock* (1966), 147 Mont. 46, 409 P.2d 808.

¶32    The Legislature also retains the ability to impose reasonable constraints upon the Board's discretion that the Board cannot ignore in carrying out its trust responsibilities. *Montrust II*, ¶ 61. For example, in *Skyline Sportsmen v. Bd. of Land Com'rs* (1997), 286 Mont. 108, 114, 951 P.2d 29, 32, in the context of a proposed exchange of school trust land, we held that "neither the Board's fiduciary duty to the trust beneficiaries nor . . . other factors" relieves the Board of its constitutional obligation to follow the "regulations and restrictions" imposed by the Legislature. We recognize that some legislative decisions may cabin the Board's discretion in managing state trust lands in the short term, but these same

decisions also may help the Board "secure the largest benefit" in the long run. These reasonable legislative regulations include various environmental and land-use restrictions. *Montrust II*, ¶ 57.

¶33    Thus, as the Court correctly concludes today, nothing in the language of § 77-1-202, MCA, that directs the Board to "secure the largest benefit," requires the Board to conduct a harvest-level financial accounting. Likewise, nothing in § 77-1-202, MCA, prevents the Board from considering various non-economic factors, including the scenic and aesthetic effects of proposed uses, in seeking to "secure the largest benefit" for trust beneficiaries when contemplating whether to approve proposed timber sales.


/S/ BRIAN MORRIS

Justice W. William Leaphart dissenting.

¶34 The Majority astutely observes that "we cannot conclude that the Board . . . has not . . . secure[d] the largest measure of benefit without a harvest-level accounting of timber sales." ¶ 23. Nor can we, I submit, conclude that the Board has fulfilled this statutory mandate absent such accounting. This is the precise reason why § 77-1-202, MCA, requires harvest-level accounting of timber sales. For in the absence of such accounting, the statutory command to the Board of Land Commissioners to "secure the largest measure of legitimate and reasonable advantage to the state," § 77-1-202(1), MCA, is rendered impotent—mere surplus verbiage. While it is true that the Board could conduct its accounting at any level of abstraction (*i.e.*, "limb by limb, tree by tree"), the most rational manner in which to do so— indeed the only manner which gives substantive meaning to the commands of § 77-1-202, MCA—is at the harvest level (*i.e.*, sale by sale). The Board makes discrete management decisions pertaining to individual timber harvests. The Board does not decide to make these sales on a "programmatic" basis; rather, the decision whether to harvest from a particular stand of trees is made, as it should be, with respect to each individual sale. Only by accounting for its actual costs on a per-sale basis can the Board have any understanding of the marginal profits (*i.e.*, "advantage to the state") reaped by its various management decisions. It takes little business acumen to know that one should not dispose of over three-quarters of a million dollars of assets in a single lump sale without bothering to look at the rate of return to one's investment. It takes even less to understand that without comparing the costs and benefits it is preposterous to suggest that one has secured the largest measure

16

of benefit. But we should be clear, as is the Majority, that financial considerations are but one of many considerations that the Board must account for in making its management decisions. Rather than excusing the Board's burying its head in the sand, however, the need to simultaneously consider each sale's environmental, ecological and silvicultural implications supports the common sense notion that the Board should consider the various costs and benefits of individual timber sales.

¶35    Aside from its financial contributions to (or incremental depletions of) the School Trust, it is clear that every timber sale will have environmental, ecological and silvicultural effects, both positive and negative. The State assures us that the Goat Squeezer sale will have the beneficial effects of promoting timber stand health and vigor by removing trees at risk of infection and will promote regeneration of shade intolerant plant species. The harvest may even increase the rate of growth of decadent portions of the stand. On the other hand, the road construction necessary to complete the sale will likely contribute to erosion and sedimentation of streams, the harvesting of trees will reduce the winter range available to white-tailed deer, and may eliminate those decadent portions of the stand which prove vital to maintaining varied ecological niches capable of sustaining diverse biota. These effects, both positive and negative, should all play into the Board's calculus in making its determination whether to proceed with the sale. Unlike the pecuniary implications of the sale, however, it makes *no sense whatsoever* to aggregate these effects in a "programmatic analysis" of all sales completed during a year. The economic, ecological and silvicultural effects of a timber harvest are inherently local. Aggregating these effects across several sales

17

would render consideration of them utterly meaningless. An improvement in white-tailed deer's winter habitat in the Elkhorn Mountains will do nothing to offset the potentially deleterious effects of the Goat Squeezer sale on the winter habitat of white-tailed deer who live in the vicinity of Swan Lake. Stream sedimentation caused by roads constructed for the Goat Squeezer sale will not be mitigated by the closure of a road in the Gallatin Canyon. Aggregating these effects forces the Board to compare apples to oranges. More importantly, it precludes the Board making informed decisions whether to proceed with any particular management decision.

¶36    Accounting on a per-sale basis not only facilitates rational management decisions today, it enables the Board to make far better decisions concerning future resource allocations and land management decisions—it promotes sustainability. All land is not created equal. Because of varying sun exposure, soil fertility—nutrient richness, moisture retention, aeration, etc.—exposure to the elements, and other variables, certain lands are better suited to growing trees for harvest than others. Because of these attributes, certain stands of forest will require more expensive, intensive management (such as pre-harvest thinning) in order to produce commercially viable timber. Although past success is not a perfect predictor of future performance, it is one extremely useful indicator at a land manager's disposal. If the management costs incurred in growing trees for timber harvest in an area greatly exceed the harvest receipts (and would do so irrespective of timber prices), this indicates that perhaps such an area could be better utilized in the future for something other than silviculture. Such adaptive management is routine practice for land managers.

18

Without the Board's accounting for the management expenditures incurred, however, its future management decisions are deprived the adaptive advantages that could be gleaned from this information.

¶37 The Legislature has told us that the Board has a duty to "secure the largest measure of legitimate and reasonable advantage to the state." Section 77-1-202(1), MCA. The Legislature has also declared that "the preservation of natural areas on state trust land has sufficient value to present and future education to meet the state's obligation for the disposition and utilization of trust land as specified in The Enabling Act." Section 76-12-103(2), MCA. There is no indication that the area comprising the Goat Squeezer sale has been designated a "natural area." *See* § 76-12-104, MCA. Nevertheless, the Legislature has established a baseline measure of benefit that must be exceeded in order to engage in extractive practices on certain trust lands. Certainly in such instances, the only way to determine whether the "advantage to the state" exceeds this baseline is by determining the marginal benefit expected from the harvest (or mine or dam).

¶38 The Majority points us to two statutory provisions that purportedly "illuminate the legislative intent regarding the Board's accounting obligations." ¶ 17. These provisions, however, say very little about the Board's duties of accounting, instead detailing the Board's duty to transmit reports to beneficiaries. Section 77-1-223, MCA, sets forth the required contents of financial reports, which the Board must prepare and provide annually to the beneficiaries. These reports must summarize the asset value of the forested tracts and calculate the average return of revenue on asset value for the forested tracts, § 77-1-223(2)-

19

(4), MCA, which is calculated by utilizing a ten-year rolling average, § 77-1-224, MCA. The Board is not explicitly required to conduct any accounting whatsoever; rather, § 77-1-223, MCA, like § 77-1-202, MCA, only implicitly requires the Board to complete any accounting. Moreover, calculating a ten-year rolling average return of revenue on asset value is not sufficient to ensure that the Board secures the largest benefit, even on a "programmatic" (*i.e.*, annual) basis. In fact, the Board could lose money on any of its individual transactions, during any single year or during a string of consecutive years, and the beneficiaries would never learn of these losses so long as the Board reported a net gain over the course of a decade. This Court has indicated that the State, as trustee, must "be able to prove 'that the information in the accounting is sufficiently accurate *and complete* to enable the beneficiaries to protect and defend the equitable or beneficial interest.'" *Montanans for the Responsible Use of the School Trust v. Darkenwald*, 2005 MT 190, ¶ 29, 328 Mont. 105, ¶ 29, 119 P.3d 27, ¶ 29 (*Montrust II*) (quoting *Loring*, *A Trustee's Handbook* § 8.24, at 622 (Charles E. Rounds, ed., 2005)). Is a ten-year rolling average return sufficiently complete to enable the beneficiaries to defend their interest? Does this method of accounting meet the Board's "higher duty to the public than . . . an ordinary businessman," *Montanans for the Responsible Use of the School Trust v. State ex rel. Board of Land Comm'rs*, 1999 MT 263, ¶ 14, 296 Mont. 402, ¶ 14, 989 P.2d 800, ¶ 14 (citation omitted), would owe to his beneficiaries? Would we tolerate such loose accounting by a private trustee? Of course not. The reporting methodology in no way interferes with the Board's ability to conduct more detailed accounting. Nor does it enable the Board to ensure that it has secured the largest

20

measure of reasonable and legitimate advantage. To that end, these procedures, aimed simply at keeping the beneficiaries moderately informed, are utterly worthless.

¶39 The majority relies primarily on two prior cases interpreting the statutory command to the Board to "secure the largest measure of legitimate and reasonable advantage to the state"—*State ex rel. Thompson v. Babcock* (1966), 147 Mont. 46, 409 P.2d 808, and *Montrust II*—both of which are easily distinguishable from the present controversy. In *Babcock*, we indicated that in order to fulfill its statutory mandate, which we described as "the principal restriction on the power of the Board," 147 Mont. at 52, 409 P.2d at 811, the Board must have "a large discretionary power." *Babcock*, 147 Mont. at 51, 409 P.2d at 811. In *Babcock*, we allowed the Board to knowingly accept less than the highest bid for the lease of agricultural lands because the interest in having a lessee who would be a good steward and not abandon the lease was deemed worthy of consideration. *Babcock*, 147 Mont. at 49, 52-53, 409 P.2d at 811. Unlike the present controversy, the Board was well informed about the return it was receiving, but chose to receive less than the maximum financial return based on non-pecuniary benefits. Here, in contrast, the Board has no sense of the return it is receiving on the Goat Squeezer sale. If the Board knew it were selling assets at a loss, it could conceivably provide an acceptable explanation for doing so, such as stemming the spread of disease in a stand of trees.

¶40 In *Montrust II*, this Court affirmed the Board's decision to sell a future stream of mineral royalties and approved the Board's method for determining the present full market value of that future stream of income. *Montrust II*, ¶¶ 32, 64. The plaintiffs challenged the

21

discount rate that the Board utilized in calculating the present value of the future stream of revenue. Both sides presented expert testimony regarding the discount rate and members of the Board testified that they had considered various discount rates before eventually selecting one. *Montrust II*, ¶¶ 45-46. We declined to "'control the discretion of the board'" in its selection of a discount rate and consequent calculation of full market value. *Montrust II*, ¶ 52 (citation omitted). Nevertheless, the Board did prospectively consider its options before selecting a discount rate and calculating the present full market value of the specific assets sold. In stark contrast to the present case, the Board did not dispose of trust assets without bothering to consider whether it was receiving a fair return (or generating any revenue at all).

¶41    Finally, to the extent that the Court's decision in *Montrust II* hinged on the "Board's discretionary authority . . . in order to effectuate sustained yield concepts and ensure the long-term strength of the trust corpus," ¶ 56, this consideration counsels against allowing the Board to proceed with timber sales under a veil of ignorance. Trees are a classic example of a renewable resource: timber can be harvested from the same land in a perpetual cycle. Growing trees for harvest, however, requires a considerable outlay of resources throughout the growth cycle. Moreover, not all land is equally fertile and conducive to silviculture. Therefore, a manager who seeks to maximize the generative capacity and income from her land should track expenditures and returns in order to rationally allocate land to its optimal uses in the future. Without doing so, it is impossible for a manager to plan so as to "secure the largest measure of legitimate and reasonable advantage" from her lands.

¶42    I dissent.

/S/ W. WILLIAM LEAPHART

Justice Patricia Cotter joins in the dissent of Justice Leaphart.

/S/ PATRICIA O. COTTER

Justice James C. Nelson dissents.

¶43     It has been a tough year for the School Trust.  First, we upheld a legislative scheme that robs the Trust of resources for future school children in the name of current tax relief (*Montanans for the Responsible Use of the School Trust v. Darkenwald*, 2005 MT 190, ¶¶ 66-69, 328 Mont. 105, ¶¶ 66-69, 119 P.3d 27, ¶¶ 66-69 (Leaphart, J., dissenting) (*Montrust II*)); throws general trust law and fiduciary principles out the window as far as the Trust is concerned; and approves a $94,000,000.00 short-fall in the Trust by 2031 (*Montrust II*, ¶¶ 70-98 (Nelson, J., dissenting)).

¶44     Now we are told by the majority at ¶ 10 of this Opinion that while the Board of Land Commissioners (the Board) does not have "unfettered discretion" in determining "fair market value," we will not find an abuse of that discretion unless the Board's action is, "in effect, fraudulent."  What a lofty standard to set for our elected trustees in their management of the lands committed under our Constitution and Enabling Act to the education of Montana's

23

children!  And, what a contrast with the standard we articulated in *State v. Babcock* (1966), 147 Mont. 46, 54, 409 P.2d 808, 812 (the State Board of Land Commissioners "owe[s] a higher duty to the public than does an ordinary businessman").  Now the standard is:  "Do what you want; just don't do something that involves bad faith, dishonesty or moral turpitude."  *See Blacks Law Dictionary* 672 (7th ed. 1999).  Now, absent being able to prove outright theft, graft or corruption, no future litigant such as Friends of the Wild Swan (FOWS) or Montrust will have a chance in litigation seeking to protect the Trust from mismanagement and waste by the Board.

¶45    Obviously, with the abuse of discretion bar set at ground level, pretty much anything the Board chooses to do under § 77-1-202, MCA, will be acceptable.  I disagree that the bar is as low as the majority says it is.  Moreover, I disagree that every decision the Board makes under such a ridiculously inadequate standard is entitled to "respectful consideration" or deference.

¶46    I agree with FOWS's argument and analysis, the majority's primer on statutory construction notwithstanding.  Section 77-1-202(1), MCA, can and should be interpreted to require that each harvest must, as the statute plainly requires, "secure the *largest* measure of legitimate and reasonable advantage to the state and provide for the long-term financial support of education."  The majority takes comfort in the fact that the statute "does not require accountings."  Likewise, it is also true that neither does the statute authorize the Board to pursue a "methodology" of "program-wide accounting on a yearly basis"--i.e.,

24

accepting losses on some harvests under the premise that at the end of the year there should, theoretically, be more profitable harvests than losers.

¶47     Even common sense dictates that one cannot secure the *largest* measure of return if that measure--profitability--is reduced by unprofitable harvests.  If I have three proposed harvests and will make a combined profitable return of $200,000.00 on two of the three, how exactly am I securing the *largest* measure of return, if I throw into that mix, the third sale on which I will lose $50,000.00?  The real problem is that the Board will never know which individual harvests are winners or losers--i.e., it will never know whether it is securing the *largest* measure of return--because it does not account for the harvests individually.  I am reminded of a pizza shop commercial a few years ago that had the proprietor saying that he loses money on each individual sale, but makes up for that in volume.

¶48     The majority's attempt to "illuminate [] legislative intent" in the provisions of §§ 77-1-223[1] and 77-1-224, MCA, is also unavailing.  These statutes--the Legislature's "affirmative efforts," as the majority puts it--are nonspecific as to accounting methods.  None require any particular accounting practice, and none prohibit an accounting method which would apprise the Board as to whether it is receiving the "*largest* measure of legitimate and reasonable advantage to the state" on each harvest.

¶49     The majority's reliance on these general statutes ignores the Board's fiduciary responsibility with respect to state trust lands.  What we stated in *Montanans for the*

---

[1]  The record reflects that the "Asset Value Reports" for trust assets in which the majority seem to take comfort are based on program-level costs that are simply estimates.

*Responsible Use of the School Trust v. Board of Land Commissioners*, 1999 MT 263, ¶ 14, 296 Mont. 402, ¶ 14, 989 P.2d 800, ¶ 14 (*Montrust I*), bears repeating here:

> The State of Montana is a trustee of those lands (hereafter, the school trust lands). *See, e.g., Toomey v. State Board of Land Com'rs* (1938), 106 Mont. 547, 559, 81 P.2d 407, 414; *State v. Stewart* (1913), 48 Mont. 347, 349, 137 P. 854, 855. Further, "The state board of land commissioners, as the instrumentality created to administer that trust, is bound, upon principles that are elementary, to so administer it as to secure the largest measure of legitimate advantage to the beneficiary of it." *Stewart*, 48 Mont. at 349-50, 137 P. at 855. The State Board of Land Commissioners (hereafter, the Board) "owe[s] a higher duty to the public than does an ordinary businessman." *State v. Babcock* (1966), 147 Mont. 46, 54, 409 P.2d 808, 812.

Whether the Board's fiduciary obligations--its higher duty to the public--are reflected in unrelated, general accounting statutes does not alter its fiduciary obligation to secure the *largest* measure of legitimate and reasonable advantage to the state trust assets. Section 77-1-202, MCA, imposes on the Board duties that would be imposed on any fiduciary. Accounting for costs to ensure each disposition of the timber assets of the trust to ensure that the *largest* advantage is achieved is part of that duty.

¶50 Furthermore, the majority's rationale--primarily focusing on legislative accounting requirements (or more properly, the lack thereof)--is not bolstered by its discussion of the Board's duties as regards forest management practices and non-economic considerations. Despite what this Court did to minimize the Board's fiduciary obligations in *Montrust II*, those trustee obligations, created under the Enabling Act and codified at § 77-1-202, MCA, require that the Board ensure the *largest* measure of legitimate and reasonable advantage to the state in the disposition of trust assets. The salient question is whether or not, at the moment of disposition, the Board can definitively state that an individual timber sale creates

26

the statutorily required "largest measure" of advantage to the state and trust beneficiaries. Without knowing the costs of the individual sale, the Board cannot answer that question; it cannot accurately evaluate the sale's economic impact; and, therefore, it cannot comply with the clear directive of § 77-1-202, MCA.

¶51 Additionally, the majority never explains how exactly forest management practices and non-economic considerations would be harmed by the Board accounting for individual harvests. If anything, those practices and considerations would be enhanced because of the Board's more detailed knowledge of the legitimate and reasonable advantages of each sale along with the associated costs. Justice Leaphart's dissent drives this point home.

¶52 Here, FOWS challenged the Goat Squeezer sale, not the annual timber harvest program for all state trust lands. The undisputed fact is that the Board does not know the costs or benefits of this sale in order to make an informed decision as to whether the sale's projected revenue warrants approval. Program-level accounting does not answer this question and, more importantly, does not obviate the Board's fiduciary obligation to realize the *largest* measure of advantage in each individual disposition of trust assets.

¶53 In summary, the record reflects that the Goat Squeezer sale will incur an estimated $750,400.00 in "expenditures" for the chosen action, Alternative C. The record also reflects that stumpage values, an important factor in determining any timber sale, continue to decline as does the rate of return on state forest lands. Here, the Board has failed to demonstrate that the subject timber sale has secured any advantage, much less the *largest* measure of legitimate and reasonable advantage which § 77-1-202, MCA, requires.

27

¶54    Interestingly, the United States Forest Service accounts for costs and revenues of each individual timber sale on federal holdings in Montana, so it cannot be that difficult an endeavor. Private businesses throughout this country utilize cost accounting as part of their cost-benefit analysis; yet, seemingly, the Board and the State of Montana lack this elemental accounting capability with respect to timber sales from School Trust lands.

¶55    The Board is not complying with § 77-1-202, MCA, if it cannot demonstrate that it has secured the *largest* legitimate and reasonable advantage to the State with regard to each sale of Trust assets. Not only has that unambiguous statutory mandate not been proven in this case; but, as a result of the Court's decision here, the Board--exercising it's nearly unlimited discretion--will not, as a practical matter, have to concern itself with this statutory requirement in the future. Under these circumstances, we can only hope, that what the State loses on individual sales, it will make up in volume.

¶56    I dissent.

/S/ JAMES C. NELSON