JUSTICE LEAPHART
dissenting.
¶34 The Majority astutely observes that “we cannot conclude that the Board ... has not... secure[d] the largest measure of benefit without a harvest-level accounting of timber sales.” ¶ 23. Nor can we, I submit, conclude that the Board has fulfilled this statutory mandate absent such accounting. This is the precise reason why § 77-1-202, MCA, requires harvest-level accounting of timber sales. For in the absence of such accounting, the statutory command to the Board of Land Commissioners to “secure the largest measure of legitimate and reasonable advantage to the state,” § 77-1-202(1), MCA, is rendered impotent-mere surplus verbiage. While it is true that the Board could conduct its accounting at any level of abstraction (i.e., “limb by limb, tree by tree”), the most rational manner in which to do so- indeed the only manner which gives substantive meaning to the commands of § 77-1-202, MCA-is at the harvest level (i.e., sale by sale). The Board makes discrete management decisions pertaining to individual timber harvests. The Board does not decide to make these sales on a “programmatic” basis; rather, the decision whether to harvest from a particular stand of trees is made, as it should be, with respect to each individual sale. Only by accounting for its actual costs on a per-sale basis can the Board have any understanding of the marginal profits (i.e., “advantage to the state”) reaped by its various management decisions. It takes little business acumen to know that one should not dispose of over three-quarters of a million dollars of assets in a single lump sale without bothering to look at the rate of return to one’s investment. It takes even less to understand that without comparing the costs and benefits it is preposterous to suggest that one has secured the largest measure of benefit. But we should be clear, as is the Majority, that financial considerations are but one of many considerations that the Board must account for in making its management decisions. Rather than excusing the Board’s burying its head in the sand, however, the need to simultaneously consider each sale’s environmental, ecological and silvicultural implications supports the common sense notion that the Board should consider the various costs and benefits of individual timber sales.
*197 ¶35 Aside from its financial contributions to (or incremental depletions of) the School Trust, it is clear that every timber sale will have environmental, ecological and silvicultural effects, both positive and negative. The State assures us that the Goat Squeezer sale will have the beneficial effects of promoting timber stand health and vigor by removing trees at risk of infection and will promote regeneration of shade intolerant plant species. The harvest may even increase the rate of growth of decadent portions of the stand. On the other hand, the road construction necessary to complete the sale will likely contribute to erosion and sedimentation of streams, the harvesting of trees will reduce the winter range available to white-tailed deer, and may eliminate those decadent portions of the stand which prove vital to maintaining varied ecological niches capable of sustaining diverse biota. These effects, both positive and negative, should all play into the Board’s calculus in making its determination whether to proceed with the sale. Unlike the pecuniary implications of the sale, however, it makes no sense whatsoever to aggregate these effects in a “programmatic analysis” of all sales completed during a year. The economic, ecological and silvicultural effects of a timber harvest are inherently local. Aggregating these effects across several sales would render consideration of them utterly meaningless. An improvement in white-tailed deer’s winter habitat in the Elkhorn Mountains will do nothing to offset the potentially deleterious effects of the Goat Squeezer sale on the winter habitat of white-tailed deer who live in the vicinity of Swan Lake. Stream sedimentation caused by roads constructed for the Goat Squeezer sale will not be mitigated by the closure of a road in the Gallatin Canyon. Aggregating these effects forces the Board to compare apples to oranges. More importantly, it precludes the Board making informed decisions whether to proceed with any particular management decision.
¶36 Accounting on a per-sale basis not only facilitates rational management decisions today, it enables the Board to make far better decisions concerning future resource allocations and land management decisions-it promotes sustainability. All land is not created equal. Because of varying sun exposure, soil fertility-nutrient richness, moisture retention, aeration, etc.-exposure to the elements, and other variables, certain lands are better suited to growing trees for harvest than others. Because of these attributes, certain stands of forest will require more expensive, intensive management (such as pre-harvest thinning) in order to produce commercially viable timber. Although past success is not a perfect predictor of future performance, it is one *198 extremely useful indicator at a land manager’s disposal. If the management costs incurred in growing trees for timber harvest in an area greatly exceed the harvest receipts (and would do so irrespective of timber prices), this indicates that perhaps such an area could be better utilized in the future for something other than silviculture. Such adaptive management is routine practice for land managers. Without the Board’s accounting for the management expenditures incurred, however, its future management decisions are deprived the adaptive advantages that could be gleaned from this information.
¶37 The Legislature has told us that the Board has a duty to “secure the largest measure of legitimate and reasonable advantage to the state.” Section 77-1-202(1), MCA. The Legislature has also declared that “the preservation of natural areas on state trust land has sufficient value to present and future education to meet the state’s obligation for the disposition and utilization of trust land as specified in The Enabling Act.” Section 76-12-103(2), MCA. There is no indication that the area comprising the Goat Squeezer sale has been designated a “natural area.” See § 76-12-104, MCA. Nevertheless, the Legislature has established a baseline measure of benefit that must be exceeded in order to engage in extractive practices on certain trust lands. Certainly in such instances, the only way to determine whether the “advantage to the state” exceeds this baseline is by determining the marginal benefit expected from the harvest (or mine or dam).
¶38 The Majority points us to two statutory provisions that purportedly “illuminate the legislative intent regarding the Board’s accounting obligations.” ¶ 17. These provisions, however, say very little about the Board’s duties of accounting, instead detailing the Board’s duty to transmit reports to beneficiaries. Section 77-1-223, MCA, sets forth the required contents of financial reports, which the Board must prepare and provide annually to the beneficiaries. These reports must summarize the asset value of the forested tracts and calculate the average return of revenue on asset value for the forested tracts, § 77-1-223(2)-(4), MCA, which is calculated by utilizing a ten-year rolling average, § 77-1-224, MCA. The Board is not explicitly required to conduct any accounting whatsoever; rather, § 77-1-223, MCA, like § 77-1-202, MCA, only implicitly requires the Board to complete any accounting. Moreover, calculating a ten-year rolling average return of revenue on asset value is not sufficient to ensure that the Board secures the largest benefit, even on a “programmatic” (i.e., annual) basis. In fact, the Board could lose money on any of its individual transactions, during any single year or during a string of consecutive *199 years, and the beneficiaries would never learn of these losses so long as the Board reported a net gain over the course of a decade. This Court has indicated that the State, as trustee, must “be able to prove ‘that the information in the accounting is sufficiently accurate and complete to enable the beneficiaries to protect and defend the equitable or beneficial interest.’ ” Montanans for the Responsible Use of the School Trust v. Darkenwald, 2005 MT 190, ¶ 29, 328 Mont. 105, ¶ 29, 119 P.3d 27, ¶ 29 (Montrust IT) (quoting Loring, A Trustee’s Handbook § 8.24, at 622 (Charles E. Rounds, ed., 2005)). Is a ten-year rolling average return sufficiently complete to enable the beneficiaries to defend their interest? Does this method of accounting meet the Board’s “higher duty to the public than ... an ordinary businessman,” Montanans for the Responsible Use of the School Trust v. State ex rel. Board of Land Comm’rs, 1999 MT 263, ¶ 14, 296 Mont. 402, ¶ 14, 989 P.2d 800, ¶ 14 (citation omitted), would owe to his beneficiaries? Would we tolerate such loose accounting by a private trustee? Of course not. The reporting methodology in no way interferes with the Board’s ability to conduct more detailed accounting. Nor does it enable the Board to ensure that it has secured the largest measure of reasonable and legitimate advantage. To that end, these procedures, aimed simply at keeping the beneficiaries moderately informed, are utterly worthless.
¶39 The majority relies primarily on two prior cases interpreting the statutory command to the Board to “secure the largest measure of legitimate and reasonable advantage to the state”-State ex rel. Thompson v. Babcock (1966), 147 Mont. 46, 409 P.2d 808, and Montrust II-both of which are easily distinguishable from the present controversy. In Babcock, we indicated that in order to fulfill its statutory mandate, which we described as “the principal restriction on the power of the Board,” 147 Mont. at 52, 409 P.2d at 811, the Board must have “alarge discretionary power.” Babcock, 147 Mont. at 51, 409 P.2d at 811. In Babcock, we allowed the Board to knowingly accept less than the highest bid for the lease of agricultural lands because the interest in having a lessee who would be a good steward and not abandon the lease was deemed worthy of consideration. Babcock, 147 Mont. at 49, 52-53, 409 P.2d at 811. Unlike the present controversy, the Board was well informed about the return it was receiving, but chose to receive less than the maximum financial return based on non-pecuniary benefits. Here, in contrast, the Board has no sense of the return it is receiving on the Goat Squeezer sale. If the Board knew it were selling assets at a loss, it could conceivably provide an acceptable *200 explanation for doing so, such as stemming the spread of disease in a stand of trees.
¶40 In Montrust II, this Court affirmed the Board’s decision to sell a future stream of mineral royalties and approved the Board’s method for determining the present full market value of that future stream of income. Montrust II, ¶¶ 32, 64. The plaintiffs challenged the discount rate that the Board utilized in calculating the present value of the future stream of revenue. Both sides presented expert testimony regarding the discount rate and members of the Board testified that they had considered various discount rates before eventually selecting one. Montrust II, ¶¶ 45-46. We declined to “ ‘control the discretion of the board’ ” in its selection of a discount rate and consequent calculation of full market value. Montrust II, ¶ 52 (citation omitted). Nevertheless, the Board did prospectively consider its options before selecting a discount rate and calculating the present full market value of the specific assets sold. In stark contrast to the present case, the Board did not dispose of trust assets without bothering to consider whether it was receiving a fair return (or generating any revenue at all).
¶41 Finally, to the extent that the Court’s decision in Montrust II hinged on the “Board’s discretionary authority... in order to effectuate sustained yield concepts and ensure the long-term strength of the trust corpus,” ¶ 56, this consideration counsels against allowing the Board to proceed with timber sales under a veil of ignorance. Trees are a classic example of a renewable resource: timber can be harvested from the same land in a perpetual cycle. Growing trees for harvest, however, requires a considerable outlay of resources throughout the growth cycle. Moreover, not all land is equally fertile and conducive to silviculture. Therefore, a manager who seeks to maximize the generative capacity and income from her land should track expenditures and returns in order to rationally allocate land to its optimal uses in the future. Without doing so, it is impossible for a manager to plan so as to “secure the largest measure of legitimate and reasonable advantage” from her lands.
¶42 I dissent.
JUSTICE COTTER joins in the dissent of JUSTICE LEAPHART.